Hon. Ronald B. Leighton

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

AT TACOMA

| | | |
|---|---|---|
| FREEDOM FOUNDATION, a Washington State Nonprofit Corporation, | ) ) ) | Civil Action No. 3:18-cv-05548-RBL |
| Plaintiff, | ) ) | |
| v. | ) ) | **PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |
| WASHINGTON DEPARTMENT OF ECOLOGY, a Washington State Agency; SANDI STEWART, in her official capacity as Director of Human Resources for the Washington Department of Ecology, | ) ) ) ) ) ) | **Noted on Motion Calendar October 25, 2019** **Oral Argument Requested** |
| Defendants. | ) ) ) | |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................... ii

INTRODUCTION ..................................................................................................... 1

EVIDENCE RELIED ON .......................................................................................... 2

STATEMENT OF FACTS ......................................................................................... 2

STANDARD OF REVIEW ........................................................................................ 8

ARGUMENT ............................................................................................................. 9

I.    Strict Scrutiny Applies to Ecology's Exclusion of Freedom Foundation ........................ 10

      a.    The Headquarters Lobby Is a Designated Public Forum ............................................ 10

b.    Ecology's Policies and Practices of Excluding Speakers Like Freedom Foundation Are Content-Based ................................................. 16

c.    The Department's Exclusion of Freedom Foundation from the Lobby Was Viewpoint-Based ................................................. 17

d.    Ecology's Practice of Denying Freedom Foundation Canvassers Access to the Lobby Fails Strict Scrutiny ................................................. 20

II.    Even if the Lobby Is a Limited or Non-Public Forum, Ecology's Practices  Still Violate the First Amendment ................................................. 21

CONCLUSION ................................................. 23

CERTIFICATE OF SERVICE ................................................. 24

## TABLE OF AUTHORITIES

### Cases

*Air Line Pilots Ass'n Int'l v. Dep't of Aviation*,
    45 F.3d 1144 (7th Cir. 1995) ................................................. 11, 15

*Ashcroft v. ACLU*,
    542 U.S. 656 (2004) ................................................. 20

*Board of Airport Comm'rs of City of Los Angeles v. Jews for Jesus*,
    482 U.S. 569 (1987) ................................................. 21-22

*Brown v. Entertainment Merchants Ass'n*,
    564 U.S. 786 (2011) ................................................. 18

*Christ's Bride Ministries, Inc. v. Southeastern Pennsylvania Transp. Auth.*,
    148 F.3d 242 (3d Cir. 1998) ................................................. 10

*City of Madison, Joint School Dist. No. 8 v. Wis. Emp't Relations Comm'n*,
    429 U.S. 167 (1976) ................................................. 17

*Cornelius v. NAACP Legal Defense and Educational Fund*,
    473 U.S. 788 (1985) ................................................. 9-11, 18, 21

*DiLoreto v. Downey Unified School Dist. Bd. of Educ.*,
    196 F.3d 958 (9th Cir. 1999) ................................................. 10

*Doe v. City of Albuquerque*,
    667 F.3d 1111 (10th Cir. 2012) ................................................. 11

*Eagle Point Educ. Ass'n v. Jackson Cty. Sch. Dist. No. 9*,
    880 F.3d 1097 (9th Cir. 2018) ................................................. 10, 21

*Forsyth County, Ga. v. Nationalist Movement,*
  505 U.S. 123 (1992) ..................................................................................21

*Hopper v. City of Pasco,*
  241 F.3d 1067 (9th Cir. 2001) ...................................................... 9-11, 15

*Janus v. Am. Fed'n of State, Cty., & Mun. Employees, Council 31,*
  138 S. Ct. 2448 (2018) ............................................................................ 1-2

*Metromedia, Inc. v. City of San Diego,*
  453 U.S. 490 (1981) ..................................................................................23

*Minnesota Voters Alliance v. Mansky,*
  138 S. Ct. 1876 (2018) ........................................................................ 21-22

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n,*
  460 U.S. 37 (1983) ....................................................................................21

*Pittsburgh League of Young Voters Educ. Fund v. Port Auth. of Allegheny Co.,*
  653 F.3d 290 (3d Cir. 2011) .....................................................................18

*Reed v. Town of Gilbert, Ariz.,*
  135 S. Ct. 2218 (2015) ..............................................................................16

*Republican Party of Minn. v. White,*
  536 U.S. 765 (2002) ..................................................................................20

*Ridley v. Massachusetts Bay Transp. Auth.,*
  390 F.3d 65 (1st Cir. 2004) ................................................................. 18-19

*Rosenberger v. Rector and Visitors of the University of Virginia,*
  515 U.S. 819 (1995) ......................................................................10, 12, 17

*Seattle Mideast Awareness Campaign v. King Cty.,*
  781 F.3d 489 (9th Cir. 2015) .......................................................... 10, 20-21

*United Food & Commercial Workers Union, Local 1099 v.*
  *Southwest Ohio Regional Transit Authority,*
  163 F.3d 341 (6th Cir. 1998) ....................................................................11

**Rule**

Fed. R. Civ. P. 56(c) ......................................................................................8

**Other Authorities**

Cooksey, Hannah, *The "Opt-Out Window": Unions' Scheme to Collect More Dues*,
  Freedom Foundation (Aug. 1, 2019), https://www.freedomfoundation.com/labor
  /the-opt-out-window-unions-scheme-to-collect-more-dues .....................................1

P.'s Mtn. for Summ. J. - iii
Case No. 3:18-cv-05548-RBL

Pacific Legal Foundation
255 South King Street, Suite 800
Seattle, Washington 98104
(916) 419-7111

# INTRODUCTION

Freedom Foundation informs public-sector workers about union expenditures and the constitutional right to opt out of union membership and dues as confirmed by *Janus v. Am. Fed'n of State, Cty., & Mun. Employees, Council 31*, 138 S. Ct. 2448 (2018). This mission is of critical importance to public-sector workers because unions often neglect to inform employees of their rights with respect to union membership. *See, e.g.*, Hannah Cooksey, *The "Opt-Out Window": Unions' Scheme to Collect More Dues*, Freedom Foundation (Aug. 1, 2019).[1] Public-sector union employees, however, are often difficult to reach, due to narrow interpretations of public disclosure laws or union hostility to Freedom Foundation's message.

In an effort to communicate with public-sector employees in a friendly, non-threatening way, Freedom Foundation canvassers visit state government buildings during the holiday season, dressed in festive attire, to hold signs and hand out holiday-themed materials. These materials include pamphlets about workers' rights with respect to union dues and membership, opt-out forms with prepaid envelopes, and facts about union expenditures.

Over the years, Freedom Foundation has been allowed to pass out such critical information in the public lobbies of various Washington state government buildings. The Washington Department of Ecology, however, asserts that only the union may speak on matters related to labor relations on Ecology premises. After Freedom Foundation canvassers visited the public lobby of Ecology headquarters in 2015, Ecology adopted a new policy as a direct response to the Foundation's leafletting that forbade visitors from promoting outside organizations. Although this policy appears to apply broadly, Ecology has allowed other outside organizations to communicate in the lobby while enforcing the policy against the Foundation. It has also allowed the union to speak in the lobby on the same topic from a different perspective. Ecology intends to continue to bar Freedom Foundation from passing out information related to workers' rights in the lobby unless this Court declares its actions unconstitutional.

---

[1] https://www.freedomfoundation.com/labor/the-opt-out-window-unions-scheme-to-collect-more-dues/.

Freedom Foundation wants to peacefully leaflet once a year in a large public lobby where expressive activities regularly occur. This will not disrupt the workplace or impair any government interest. The Foundation asks therefore that this Court vindicate the Foundation's right to use a public forum for peaceful expression regarding issues of critical importance to state workers.

## EVIDENCE RELIED ON

This motion relies on the declaration of Ethan Blevins, Plaintiff's counsel in this matter, and Matthew Hayward, Freedom Foundation's outreach director. It also cites depositions taken by both parties, as well as emails and other documents disclosed in the course of discovery and authenticated by Ecology. The motion also relies upon a video recorded by Freedom Foundation staff, along with a written transcript, authenticated by the accompanying declarations. Photographs and Freedom Foundation materials are also included and authenticated by declaration.

## STATEMENT OF FACTS

**Plaintiff Freedom Foundation**

Freedom Foundation is a Washington non-profit organization devoted to individual liberty, free enterprise, and limited, accountable government. Its work includes public advocacy, research, canvassing, and litigation. The clash between constitutional rights and compulsory unionization is Freedom Foundation's highest priority. The United States Supreme Court has held that public-sector employees have a constitutional right to refrain from joining a union and paying non-member dues. *See Janus*, 138 S. Ct. at 2460. Having found that public-sector unions often keep state employees in the dark regarding their rights, the Foundation canvasses to notify government employees of their rights with respect to public sector unions, such as Washington Federation of State Employees (WFSE) and American Federation of State, County, and Municipal Employees (AFSCME).

Freedom Foundation canvassers go door-to-door and visit government office buildings. Canvassers are trained to avoid aggressive or coercive engagement and "hand out flyers to people who are interested, talk to people who are willing to talk to you, smile, always be polite, stay out

P.'s Motion for Summ. J. - 2
Case No. 3:18-cv-05548-RBL

Pacific Legal Foundation
255 South King Street, Suite 800
Seattle, Washington 98104
(916) 419-7111

of the way." Exh. 1 at 10-11, 49, lines 3-5; Exh. 2 at 14, lines 1-7. Likewise, they are trained to avoid non-public areas. Exh. 2 at 17-18.

Before visiting state buildings, the Foundation's outreach director contacts building administrators or security to notify the state of an upcoming visit and ask where canvassers are allowed to go on the property. Exh. 1 at 13, lines 17-19; Exh. 2 at 15, lines 7-11.

Because the union continues to withhold critical information concerning the rights of public employees, Freedom Foundation wants to send canvassers to quietly hand out leaflets in the lobby at the Washington Department of Ecology's Lacey headquarters during future holiday seasons. Declaration of Matthew Hayward ¶ 7. Freedom Foundation does not seek to disrupt work or access non-public areas of the building. *Id.* ¶ 6. The Foundation wishes to hand out information in the lobby area because canvassers can contact more employees and distribute their message more effectively there than outside the building. *Id.* ¶ 8.

**Holiday Canvassing in 2015**

In December 2015, Freedom Foundation sent canvassers to the Thurston County lobbies of the Washington Department of Natural Resources, the Washington Department of Enterprise Services, and Ecology. Exh. 1 at 37-38. The canvassers dressed in Santa Claus costumes and carried holiday-themed materials because a festive approach attracts attention and creates a friendly atmosphere. *Id.* at 14, lines 6-16.

At each location, one or two canvassers carried a poster, a sign, and handouts. Freedom Foundation's name did not appear on any of the written materials, nor did the materials promote the Foundation. The poster was red, white, and green and decorated with snowflakes. *See* Exh. 3. At the top of the poster, in large font, were the words, "Give Yourself a Raise." *Id.* Below, in smaller font, it said: "You work hard for your money—keep more of it." *Id.* And, at the bottom, the poster explained how to opt out. *Id.*

Canvassers also carried a smaller sign depicting an unfurled scroll on a red background. *See* Exh. 4. In stylized lettering at the top of the scroll were the words "Santa's List." *Id.* The sign listed "Naughty Union Facts," describing how much money the union collected in dues and fees

P.'s Motion for Summ. J. - 3
Case No. 3:18-cv-05548-RBL

Pacific Legal Foundation
255 South King Street, Suite 800
Seattle, Washington 98104
(916) 419-7111

and how that money was spent. *See id.* This included the fact that $6.6 million of the $23 million collected in dues and fees went to AFSCME headquarters in DC to fund its political agenda. *Id.* The canvassers also carried opt-out forms packaged in envelopes marked with the phrase, "Give Yourself a Raise." *Id.*; *see also* Exh. 1 at 35, lines 9-12.

At both Enterprise Services and Natural Resources, law enforcement personnel confirmed that Freedom Foundation could hand out information in the public lobby. *Id.* at 37-38. The Foundation's visit to Ecology was very different.

In December 2015, the Foundation's outreach director, Matthew Hayward, and canvasser Elmer Callahan visited Ecology headquarters in Lacey, Washington. They checked in at the front desk, informed the receptionist why they were there, and gave her a Freedom Foundation business card. *Id.* at 25, lines 3-6, 28, lines 11-15. The security guard on duty, Ken Nasworthy, was under the mistaken impression that the Freedom Foundation employees were from the union—Freedom Foundation staff were unaware of this misapprehension at the time—and informed them that they could have access to the whole building if they signed in. *Id.* at 24-25, 27-28, lines 16-23.

Mr. Callahan, dressed as Santa Claus, signed in and entered the lobby while Matthew Hayward remained at the front. *Id.* at 25. Mr. Callahan had entered non-public areas because he was invited to a holiday party by an Ecology employee. Exh. 5 at 24-25, lines 22-25. Soon after, another Ecology employee led Mr. Callahan back to security. Exh. 6 at 9-10.

When Mr. Nasworthy realized that the two visitors were with Freedom Foundation, he became agitated and told them that Ecology had a good relationship with the union and that the union did not want Freedom Foundation on the premises. *Id.* at 19; Exh. 1 at 25, 31, lines 2-7; Exh. 5 at 28, lines 19-20; Exh. 7 at 5-6. He then physically removed Mr. Callahan and Mr. Hayward from the building. Exh. 1 at 25, lines 14-17. Mr. Hayward contacted Freedom Foundation's legal counsel, who soon arrived to speak with Mr. Nasworthy. *Id.* at 25, lines 18-24.

David Dewhirst, a Freedom Foundation attorney at the time, asked Mr. Nasworthy if Freedom Foundation canvassers could pass out information in the building. Exh. 7 at 1-2. Mr. Nasworthy asserted that "the public areas are okay." *Id.* at 2; Exh. 6 at 15, lines 18-20. When Mr.

P.'s Motion for Summ. J. - 4
Case No. 3:18-cv-05548-RBL

Pacific Legal Foundation
255 South King Street, Suite 800
Seattle, Washington 98104
(916) 419-7111

Dewhirst asked what areas were public, Mr. Nasworthy asserted that "public areas" included the lobby and the cafeteria. Exh. 7 at 6.

Sandi Stewart, Ecology's Human Resources Director, also joined the conversation. Ms. Stewart asserted that the canvasser could enter public spaces such as the lobby and the cafeteria during open hours. *Id.* at 10-14. Ms. Stewart asked them how long they expected to be in the building and confirmed whether they signed in. *Id.* at 13-14. Mr. Dewhirst then, with Ms. Stewart still present, informed the outreach director and the canvasser that they were "well within their rights" to leaflet in the public spaces of the building and explained what those public spaces were based on the conversation with Ms. Stewart. *Id.* at 14.

**Ecology Adopts New Speech Restriction in Response to Freedom Foundation**

After this 2015 incident, Ecology added new language to Administrative Policy 14-10, entitled "Reserving and Using Ecology Facilities," that purported to restrict visitor expression while on Ecology premises. Exh. 8; Exh. 9 at 7. Section 2 of Policy 14-10—which became effective in April 2017—begins with a bolded heading: "Visitors may not use Ecology facilities to promote or conduct commercial enterprise." Exh. 8. Below the heading is an indented description of the rule: "Visitors also may not use Ecology facilities to promote or solicit for an outside organization or group." *Id.* Ecology's designated representative stated that this language was added to Policy 14-10 in response to Freedom Foundation's visit described above. Exh. 9 at 7, lines 11-18.

**Holiday Canvassing in 2017**

In December 2017, the Freedom Foundation once again sent holiday canvassers to state buildings to inform workers how to opt out of union dues if they so desired. *See* Exh. 1 at 76, lines 1-6, 103, lines 3-8; Exh. 10 at 23. As before, canvassers dressed as Santa were allowed to leaflet in the lobbies of several state buildings, including the Department of Natural Resources and the Department of Fish and Wildlife. Exh. 10 at 23, lines 10-16.

The holiday canvassers in 2017 carried a poster and handouts. Once again, no materials contained Freedom Foundation's name or promoted the Foundation. The poster was green and red,

P.'s Motion for Summ. J. - 5
Case No. 3:18-cv-05548-RBL

Pacific Legal Foundation
255 South King Street, Suite 800
Seattle, Washington 98104
(916) 419-7111

with an image of a lump of coal in the middle. *See* Exh. 11 at 6. At the top, in large font, were the words "WFSE has been naughty." *Id.* In the bottom half, the poster listed an internet address: OptOutToday.com, which directs readers to a website entitled "Opt Out Today." *See id.* The December 2017 site explained workers' rights with respect to union membership. *Id.* at 1-2. The poster did not list Freedom Foundation's name, and neither the poster nor the website promoted or solicited for the Foundation. *Id.*

As in 2015, canvassers carried opt-out forms along with an enclosed pamphlet explaining the right to opt out. *See id.* at 7-10. The pamphlet also included an explanation of how the union has spent employees' dues: "1.5% of your wages, up to $945, are withheld for union dues each year. Roughly 25% of that money is sent to the national union, AFSCME, in Washington, D.C." *Id.* at 8. Canvassers also carried a "Santa's List" leaflet listing "Naughty union facts." *See id.* at 3. The 2017 handout stated: "WFSE has long claimed it doesn't spend members' dues on politics, but a recent investigation by the state Public Disclosure Commission proved this is simply false . . . . No matter your political views, state workers shouldn't have their dues used for Greg Devereux's political agenda without their knowledge and permission. Thankfully, your ability to avoid supporting WFSE's political expenditures is constitutionally protected." *Id.* At the bottom was another reference to OptOutToday.com. *See id.*

Before visiting Ecology, Matthew Hayward—the Freedom Foundation outreach director— spoke with Ms. Stewart about canvassing plans. Exh. 1 at 36, lines 12-20. She told Mr. Hayward that Freedom Foundation would not be allowed to leaflet in the lobby. *Id.* at 65, lines 17-23. Mr. Hayward asked for a written policy that forbade such activity. *Id.* at 66, lines 1-11. In response, Ms. Stewart sent Mr. Hayward an email attaching the newly amended Policy 14-10. *See* Exh. 12. Mr. Hayward stated his belief that the policy did not forbid Freedom Foundation's plans because Freedom Foundation's speech was not promoting itself or soliciting. *Id.* at 4.

Soon after, a Freedom Foundation canvasser named Sandy Belzer went to Ecology headquarters, accompanied by a photographer and an attorney for Freedom Foundation. Exh. 10 at 30-31. Ms. Belzer, dressed as Santa, was carrying the poster and handouts described above. *See*

P.'s Motion for Summ. J. - 6
Case No. 3:18-cv-05548-RBL

Pacific Legal Foundation
255 South King Street, Suite 800
Seattle, Washington 98104
(916) 419-7111

Exh. 11. They entered the public entrance of Ecology headquarters, and Ms. Belzer began handing out leaflets in the lobby. Exh. 10 at 32.

Ms. Stewart approached and told them that they could not pass out information inside the building. *Id.* The Freedom Foundation attorney, Hannah Marcley, asked why Freedom Foundation canvassers could not pass out information in the lobby even though WFSE used the lobby for representational activities. Exh. 13 at 29, lines 5-7. Ms. Stewart told Ms. Marcley that the WFSE could use the lobby because of the collective bargaining agreement between Ecology and WFSE. *Id.* at 35, lines 3-8. After the conversation ended, Foundation staff left Ecology. *Id.* at 29, lines 14-16. This incident is the only time Section 2 of Policy 14-10 has been used to remove an outside organization from Ecology's premises. *See* Exh. 14 at 79, lines 5-8.

**Ecology Headquarters Lobby**

Ecology's headquarters is a three-story, 323,000-square-foot building, open from 8:00AM to 5:00PM, Monday through Friday. Declaration of Ethan W. Blevins ¶ 3. The building houses about 900 employees, in addition to staff for several tenant agencies. *Id.*

The public entrance opens into the lobby, a high-ceilinged atrium with the north and south sides bordered by floor-to-ceiling windows. There are reception and security desks adjacent to the lobby entrance, and a placard in front of the entrance directing visitors to sign in and receive a badge. Blevins Decl. ¶ 5; Exh. 15; Exh. 16. The lobby is approximately 11,000 square feet and contains seating, artwork, partitioned areas designated as meeting spaces, and large open areas for foot traffic. *See* Exh. 15; Exh. 16. The seating areas in the lobby serve as "places for conversation." Exh. 14 at 55, lines 18-24.

**Expressive Activity in the Lobby**

Ecology regularly hosts activities in the lobby that include expression by outside organizations. For example, every year Ecology holds a farmers' market in the lobby, which lasts most of the day. *See* Exh. 17; Exh. 14 at 69-70. Employees donate items to the farmers' market, and the sale proceeds go to a charitable fund. *See* Exh. 14 at 69-70. Local charities have participated in the farmers' market in the past. *See* Exh. 17.

Pacific Legal Foundation
255 South King Street, Suite 800
Seattle, Washington 98104
(916) 419-7111

Ecology also holds an annual plant sale in the lobby for charitable fundraising. *See* Exh. 18; Exh. 14 at 63-64. Ecology has approved the presence of the Thurston County Food Bank and Master Gardeners Foundation of Thurston County and allowed those groups to share information about their organizations during at least one of the plant sales. *See* Exh. 18. In 2016, the plant sale was so loud that it disrupted employees. Despite this, Ecology has continued to hold the sale in the lobby. *See* Exh. 19.

Ecology has also allowed outside organizations to share commuter information in the lobby. For instance, Ecology allowed Intercity Transit—a local transit authority—to hold a "transit fair" in the lobby in October 2017 for several hours. *See* Exh. 20; Exh. 9 at 34-38; Exh. 14 at 71-75. And in 2018, Ecology allowed Joy Ride Bikes—a private company—to perform an hour-long bike repair demonstration in the lobby. *See* Exh. 21.

WFSE also frequently uses the lobby for expressive activity. The union holds frequent "tabling" events in the lobby, often twice a month, where union representatives set out a table and engage in speech with Ecology employees, including one-sided discussions about the Supreme Court's *Janus* decision—the very topic of Freedom Foundation's pamphlets. *See* Exh. 22; Exh. 23.

The lobby has played a host to a number of other events, including pet photo contests, travel photo contests, art receptions, Peace Corps week, and employee art shows.[2] These are only documented activities, and Ecology security stated that leafletting in the lobby by various organizations is a frequent occurrence. *See* Ex. 7 at 3.

### STANDARD OF REVIEW

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

---

[2] Photo contests, *see* Exh. 14 at 68. Art receptions, *see* Exh. 14 at 84-86; Exh. 24; Exh. 25. Peace Corps, see Exh. 26.

P.'s Motion for Summ. J. - 8
Case No. 3:18-cv-05548-RBL

Pacific Legal Foundation
255 South King Street, Suite 800
Seattle, Washington 98104
(916) 419-7111

## ARGUMENT

If a forum is public, by either tradition or designation, then strict scrutiny applies to content-based or viewpoint-based speech restrictions in that forum. *See Cornelius v. NAACP Legal Defense and Educational Fund*, 473 U.S. 788, 800 (1985). If the forum is not public, then the speech restriction must be reasonable and viewpoint neutral. *See Hopper v. City of Pasco*, 241 F.3d 1067, 1075 (9th Cir. 2001).

In direct response to Freedom Foundation's attempt to pass out information in the lobby, Ecology adopted a vague rule purporting to bar outside organizations from engaging in expressive activity on Ecology premises. Ecology, however, regularly allows for a range of expressive activities in the lobby, including expression by outside organizations. Ecology's lobby therefore qualifies as a designated public forum. Ecology's enforcement of speech regulations applicable to the lobby is both content-based and viewpoint-based: Ecology has taken the position that the WFSE is the only organization allowed to speak about labor relations on Ecology premises. Moreover, Ecology has conceded that the regulations require examination of speech's content, and the regulation at issue was not only created in direct response to Freedom Foundation's canvassing within the lobby—it has been used to uniquely target the Foundation's speech efforts while granting access to other speakers. Ecology's speech restrictions do not further a compelling government interest.

Even if the lobby is a non-public forum, Ecology's speech restrictions still have to be reasonable and viewpoint neutral. Ecology's use of policy to target Freedom Foundation's attempt to share unflattering facts about the union, while allowing pro-union expression, is not viewpoint-neutral. Moreover, Ecology's policies are not reasonable because they are vague and inconsistently applied. Moreover, the proposed leafletting by Freedom Foundation will not imperil any legitimate government interest.

P.'s Motion for Summ. J. - 9
Case No. 3:18-cv-05548-RBL

Pacific Legal Foundation
255 South King Street, Suite 800
Seattle, Washington 98104
(916) 419-7111

**I.      Strict Scrutiny Applies to Ecology's Exclusion of Freedom Foundation**

Ecology's exclusion of Freedom Foundation from the public lobby must satisfy strict scrutiny because the lobby is a designated public forum and Ecology's policy and practices are content-based and viewpoint-based.

**a.      The Headquarters Lobby Is a Designated Public Forum**

The lobby is a designated forum for three reasons: (1) Ecology's policy does not draw clear lines between permissible and impermissible speech; (2) haphazard and selective enforcement renders the policy ineffectual in closing off the forum; and (3) the lobby is compatible with expressive activity.

Government property is either a traditional public forum, a designated public forum, or a limited/non-public forum. *Eagle Point Educ. Ass'n v. Jackson Cty. Sch. Dist. No. 9*, 880 F.3d 1097, 1105 (9th Cir. 2018). A designated public forum is a space where the government has voluntarily opened its property as a forum. *Hopper*, 241 F.3d at 1074.[3] While the government may control access to its property to some degree, if it has opened its property to expression, it "must respect the lawful boundaries it has itself set." *Rosenberger v. Rector and Visitors of the University of Virginia*, 515 U.S. 819, 829 (1995).

A designated public forum exists where a government grants access to the property for expression by members of the public or a particular class of speakers. *See Seattle Mideast Awareness Campaign v. King Cty.*, 781 F.3d 489, 496 (9th Cir. 2015). There are three factors courts consider: the policy governing speech, past enforcement of the policy, and the nature of the forum. *See Cornelius*, 473 U.S. at 802; *Seattle Mideast Awareness Campaign*, 781 F.3d at 497.

The first point of analysis is the government's established policy on speech. A policy that purports to close a forum must offer "unambiguous and definite" standards for inclusion and exclusion. *Hopper*, 241 F.3d at 1077 (quoting *Christ's Bride Ministries, Inc. v. Southeastern Pennsylvania Transp. Authority*, 148 F.3d 242, 251 (3d Cir. 1998)). Further, courts look to the

---

[3] Traditional public forums include parks, sidewalks, and streets—spaces where a wide variety of speech has occurred by long-standing tradition. *DiLoreto v. Downey Unified School Dist. Bd. of Educ.*, 196 F.3d 958, 964 (9th Cir. 1999).

P.'s Motion for Summ. J. - 10
Case No. 3:18-cv-05548-RBL

Pacific Legal Foundation
255 South King Street, Suite 800
Seattle, Washington 98104
(916) 419-7111

"selectivity" used in opening a forum to particular speakers. *Hopper*, 241 F.3d at 1078. "In general, the more restrictive the criteria for admission and the more administrative control over access, the less likely a forum will be deemed public." *Id.*

The second factor is history of policy enforcement. Beyond the rules themselves, "consistency in application is the hallmark of any policy designed to preserve the non-public status of a forum." *Id.* at 1076. Haphazard enforcement indicates that a policy does not close the forum. *Id.* Nor can the government hash together a policy "to implement its newly-discovered desire to suppress a particular message." *Air Line Pilots Ass'n Int'l v. Dep't of Aviation*, 45 F.3d 1144, 1153 (7th Cir. 1995), *quoted approvingly in Hopper*, 241 F.3d at 1077.

The Ninth Circuit looked to policy enforcement in *Hopper v. City of Pasco*. City officials opened an art gallery at city hall limited to "noncontroversial" art. *Hopper*, 241 F.3d at 1078. The court, however, held that this was "no policy at all" because it had only been applied against the plaintiffs' artwork. *Id.* This capricious enforcement did not close the forum, and the Ninth Circuit was therefore "bound to conclude that the city opened its halls to expressive activity and thereby created a designated public forum in the art gallery." *Id.*

Third, courts look to the nature of the forum, asking "whether the expressive activity is consistent with [its] principal function." *Hopper*, 241 F.3d at 1078. Courts should therefore "examine [] the nature of the property and its compatibility with expressive activity." *Cornelius*, 473 U.S. at 804. If the forum is open to the public without need for pre-approval, then the forum's nature leans toward a designated public forum. *See Doe v. City of Albuquerque*, 667 F.3d 1111, 1129-30 (10th Cir. 2012) (holding a library to be a designated public forum in part because of public access). Courts "must also examine the relationship between the reasons for any restriction on access and the forum's purpose." *United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio Regional Transit Authority*, 163 F.3d 341, 351 (6th Cir. 1998).

Here, Ecology cannot escape the simple fact that it has thrown open its doors to a parade of expressive activity in the lobby: a transit fair, union events, a bike repair demonstration, photo contests, art shows, plant sales, and farmers' markets, just to name the documented activities. This

Pacific Legal Foundation
255 South King Street, Suite 800
Seattle, Washington 98104
(916) 419-7111

behavior exhibits an intent to create an open forum. In so doing, it now "must respect the lawful boundaries it has itself set" by allowing other speech unless it can demonstrate a compelling interest for excluding it. *Rosenberger*, 515 U.S. at 829.

In addition, the three factors to analyze—policy language, policy enforcement, and nature of the forum—all point in that same direction. As to the first factor, Ecology's policy is not the "unambiguous and definite" standard that suffices to close a forum. Ecology claims that Section 2 of 14-10 prohibits Freedom Foundation from providing information about public-sector employee rights in the lobby. *See* Exh. 8; Exh. 9 at 7, lines 13-18. That section, however, is entitled "Visitors May Not Use Ecology Facilities *to Promote or Conduct Commercial Enterprise*." Exh. 8 (emphasis added). Below that heading, Section 2 says: "Visitors also may not use Ecology facilities to promote or solicit for an outside organization or group. The only exceptions are public hearings or meetings held according to this policy, or activities as a charitable activity according to Policy 15-01." *Id.*

Ecology's interpretations of Section 2 display the type of breadth and flexibility that will defeat an attempt to close a forum. Although the title to Section 2 states that it applies only to commercial activity, Mr. Norberg expanded the rule by broadly defining the word "promote" as meaning to "solicit, provide information, [or] interact . . . for an outside organization." Exh. 9 at 15, lines 9-13. Ecology likewise defines "solicit" "in conjunction with promotion, whether that be providing leaflets or flyers supporting that promotion of an organization." *Id.* at lines 17-19. Mr. Norberg defined an "outside organization" as "anything that's not part of the Department of Ecology, that is not a tenant of an Ecology facility, that is not the Washington Federation for State Employees as described in the Collective Bargaining Agreement, and is not approved as a charitable organization or event in accordance with Policy 15-01." According to Ecology, an "outside organization" can be a single individual. Exh. 9 at 20-21; Exh. 14 at 48, lines 12-16.

Policy 14-10 is too indefinite to close the forum because it fails to clearly define key terms like "promote" or "solicit," and Ecology's interpretation only adds to the lack of clarity. For example, when asked whether Freedom Foundation could hand out information that didn't include

Pacific Legal Foundation
255 South King Street, Suite 800
Seattle, Washington 98104
(916) 419-7111

Freedom Foundation's name, Mr. Norberg said this would still be forbidden because the materials handed out "would be connected to an outside organization." Exh. 9 at 17, lines 7-11. When asked what "connected to an outside organization" meant, Mr. Norberg simply reiterated that handouts would be forbidden even if they did not identify an outside organization. *Id.* This is consistent with Ecology's enforcement of the policy against Freedom Foundation—none of the Foundation's materials promoted, solicited for, or even mentioned the Foundation, yet Ecology nonetheless excluded the Foundation's speech. *See* Exh. 4; Exh. 11.

Ecology's interpretation extending Policy 14-10 to speech disconnected from an outside organization clouds the policy's already uncertain language. Mr. Norberg, for instance, testified that the policy would prohibit an individual from handing out a flyer that stated "Save our salmon," even if the visitor was not connected to any outside organization, because "those types of activities can encourage conversation in the lobby," which could be disruptive. *Id.* at 26. Mr. Norberg could not explain, however, what kind of conversations are more or less likely to be disruptive. Nor could he explain why the many other activities allowed in the lobby, from art shows to farmers' markets to transit fairs to bike repair seminars put on by private business do not encourage disruptive conversation. Indeed, portions of the lobby are both intended and designed for conversation. *See* Exh. 14 at 55 (seating areas in the lobby are meant to be "places for conversation").

Mr. Norberg's testimony further obscured the policy when addressing its application to verbal communication. When asked if a verbal communication would be permitted if it did not mention an outside organization, Mr. Norberg said government officials would have to "confer." Exh. 9 at 18, lines 2-5. He could not explain, however, what criteria would constrain or guide those officials. When asked if a single member of the public who is not representing any organization could talk about something unrelated to Ecology business while on Ecology premises, Mr. Norberg said the propriety of that expression "would be dependent upon the content of that communication." *Id.* at 21. Again, he offered no guidelines as to how officials should judge the propriety of content.

P.'s Motion for Summ. J. - 13
Case No. 3:18-cv-05548-RBL

Pacific Legal Foundation
255 South King Street, Suite 800
Seattle, Washington 98104
(916) 419-7111

While Mr. Norberg equivocated between what constituted permissible and impermissible speech under Policy 14-10, he confirmed that at least one type of expression is safe: communication related to Ecology business. *Id.* at 19. He could not, however, define what it meant for speech to be related to Ecology business, leaving that determination to official discretion. *Id.* at 38-39. If officials deemed speech as unrelated to Ecology business, then its propriety would plunge back into deeper obscurity and "depend on the circumstances surrounding the conversation and the conversation itself." *Id.* In making such a determination, Mr. Norberg said Ecology officials decide on a case-by-case basis what speech complies with Policy 14-10. *See id.* at 20, 28.

Policy 14-10, as written and interpreted, does not draw clear enough lines to establish a closed, non-public forum. Ecology interprets the policy as forbidding speech that is neither promotion nor solicitation and that is not even connected to an outside organization, yet Ecology interprets the same policy to allow some promotion and solicitation that *is* connected to an outside organization, so long as the speech is "passive," or the speaker lacks an "intent" to promote or solicit, or the speech is sufficiently "related to" Ecology business. *See id.* at 19, 24, 32. This vague rule does not create clear lines limiting the forum.

As to the second factor, Ecology's loose enforcement is further evidence of a designated public forum. Ecology regularly allows outside organizations to use Ecology premises for communication. For instance, Intercity Transit, a local transit authority, hosted a "transit fair" to advertise commuting options in the lobby in October 2017, after Section 2 of Policy 14-10 went into effect. Exh. 20. Similarly, a business called Joy Ride Bikes was invited to give a bike repair demonstration in the lobby. Exh. 9 at 39-40; Exh. 21. Mr. Norberg testified that such expression, though it constitutes promoting for an outside organization, is permissible because it's "related to Ecology work." Exh. 9 at 36, lines 21-24. Ecology likewise said that outside organizations could conduct yoga, Zumba, or similar classes in the lobby because "wellness activities" are related to Ecology's work because they improve effectiveness. Exh. 27 at 31. If even wellness classes fit into this elastic concept of "Ecology business," then it is not clear why issues related to personal income, labor law, or workers' rights are not related to "Ecology business." In short, Ecology

P.'s Motion for Summ. J. - 14
Case No. 3:18-cv-05548-RBL

Pacific Legal Foundation
255 South King Street, Suite 800
Seattle, Washington 98104
(916) 419-7111

officials "have the discretion" to decide whether speech by outside organizations in the lobby relates to Ecology work and may therefore sidestep Policy 14-10. *See id.* at 38-39.

Perhaps the outside organization that most often promotes itself in the lobby is the union itself—the very organization that Freedom Foundation's speech criticizes. The union is in the lobby communicating with Ecology employees about twice a month, including discussions giving the union's view on the Supreme Court's *Janus* decision. *See* Exh. 21; Exh. 22. Indeed, Ecology does not even monitor the union's expression while on Ecology premises to ensure compliance with any speech restrictions. Exh. 14 at 60, lines 12-21.

Ecology's ad hoc exceptions to Policy 14-10 demonstrate a lack of consistent enforcement, which favors finding a designated public forum. Since the policy's adoption, Ecology has allowed at least three outside organizations to promote and solicit in the lobby without signed authorization—Intercity Transit, Joy Ride Bikes, and the union. Indeed, the allowances made for Ecology-related speech appears to be a deviation from the purpose of Policy 14-10, which is purportedly designed to treat all visitors equally to ensure fairness and equal treatment. *See* Exh. 8. Where "exceptions are haphazardly permitted" like this, the policy does not close the forum. *Hopper*, 241 F.3d at 1076.

Moreover, Ecology has rejected only one outside organization's speech under Policy 14-10—Freedom Foundation, the very organization that prompted Ecology to create Section 2 of Policy 14-10. *See* Exh. 14 at 79, lines 1-8. Like in *Hopper*, the fact that the program has been applied only against the Plaintiffs in this action cuts against Ecology's claimed desire to maintain a non-public forum and indicates that Section 2 is really "no policy at all." *See Hopper*, 241 F.3d at 1078. Indeed, the department's single-minded focus both in creation of section 2 and its enforcement gives the appearance of policy masking a "newly-discovered desire to suppress a particular message." *Air Line Pilots Ass'n Int'l*, 45 F.3d at 1153, *quoted approvingly in Hopper*, 241 F.3d at 1077. This kind of targeted attempt to shut out a particular speaker—while allowing others—shows that Policy 14-10 does not close the forum to expression.

Pacific Legal Foundation
255 South King Street, Suite 800
Seattle, Washington 98104
(916) 419-7111

Finally, the third factor, nature of the forum, lends itself to a designated public forum. The lobby is a sprawling open space accessible to the general public. *See* Exh. 16. While visitors must sign in, they need not justify their reason for visiting Ecology premises in order to enter the lobby. *See* Exh. 6. at 24, lines 10-18; *see also* Hayward Decl. ¶ 6. Members of the public use the lobby to travel to and from the cafeteria. Exh. 14 at 11, lines 10-24. There is a significant amount of foot traffic, including members of the public, through the lobby on a frequent basis. *See* Exh. 6 at 24. There are seating areas throughout the lobby designed as "places for conversation." Exh. 14 at 55. The lobby is also a frequent site for various events, such as farmers' markets, plant sales, art and photo exhibitions, and more. As Ecology has deemed the lobby appropriate for such activities, this demonstrates that such activity can be non-disruptive and appropriate for the forum's nature. The large open space, the public access, the high amount of foot traffic, the location relative to the entrance and adjoining areas, and the seating areas make the lobby much like a public plaza where expressive activity is natural and expected.

**b.  Ecology's Policies and Practices of Excluding Speakers Like Freedom Foundation Are Content-Based**

Speech restrictions in a designated public forum must face strict scrutiny if they "target speech based on its communicative content." *Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218, 2226 (2015). If a law is triggered by "the topic discussed or the idea or message expressed," then the law is content-based. *Id.* at 2227. Laws that define regulated speech by "particular subject matter" or "function or purpose" are content-based. *Id.* Even if a law is content-neutral on its face, it will still be considered content-based if it "cannot be justified without reference to the content of the regulated speech." *Id.* (internal quotation marks omitted).

Policy 14-10 is content-based on its face. By its plain language, it forbids promotion or solicitation "for an outside organization." Exh. 8. Determining whether speech is promotion or solicitation requires consideration of content. Moreover, enforcers must refer to content to determine whether the speech is connected to an outside organization.

P.'s Motion for Summ. J. - 16
Case No. 3:18-cv-05548-RBL

Pacific Legal Foundation
255 South King Street, Suite 800
Seattle, Washington 98104
(916) 419-7111

Mr. Norberg confirmed the content-based nature of Ecology's speech regulation. When asked whether "the content of the communication" would be a "relevant factor" when enforcing Policy 14-10, he said, "It would be considered, yes." Exh. 9 at 20, lines 16-20. Likewise, when asked whether a single member of the public disassociated from an outside organization could speak in the lobby on matters unrelated to Ecology business, Mr. Norberg said, "I think it would be dependent upon the content of that conversation." *Id.* at 21, lines 9-11.

The ad-hoc exceptions that Ecology has allowed also require content-based consideration. Ecology must examine content to apply its exception for speech related to Ecology business. *See* Exh. 9 at 38-39. Indeed, Mr. Norberg testified that determining whether written materials are related to Ecology business requires that such materials "would have had to have been reviewed and approved by Ecology officials." Exh. 9 at 41, lines 5-7. Policy 14-10's enforcement requires reference to speech's content and is therefore subject to strict scrutiny.

### c. The Department's Exclusion of Freedom Foundation from the Lobby Was Viewpoint-Based

"In the realm of private speech or expression, government regulation may not favor one speaker over another." *Rosenberger*, 515 U.S. at 828. Viewpoint discrimination arises when "the government targets not subject matter, but particular views taken by speakers on a subject." *Id.* at 829. A viewpoint-based speech restriction is therefore "an egregious form of content discrimination." *Id.* Viewpoint-based speech restrictions in any forum type must satisfy strict scrutiny.

Ecology's position on speech about labor relations demonstrates viewpoint discrimination. Ecology's designated representative responded "yes" when asked whether the union is "the only organization that can speak to union related issues on Ecology premises." Exh. 27 at 17, lines 17-22. This position defies Supreme Court precedent establishing that the government may not grant a union the exclusive right to speak on labor relations when managing a forum. *See City of Madison, Joint School Dist. No. 8 v. Wis. Emp't Relations Comm'n*, 429 U.S. 167, 173, 175-76 (1976) (holding that a state commission violated the First Amendment when it determined that

P.'s Motion for Summ. J. - 17
Case No. 3:18-cv-05548-RBL

Pacific Legal Foundation
255 South King Street, Suite 800
Seattle, Washington 98104
(916) 419-7111

only the union was allowed to present its view during a public meeting on a labor-relations matter). Ecology grants union representatives frequent access to the lobby for unmonitored expression, including expression about the Supreme Court's controversial *Janus* decision. *See* Exh. 14 at 60; Exh. 22. Yet it wholly excludes an organization seeking to share unflattering facts about the union. *See* Exh. 14 at 60. The security guard who removed Ecology from the premises in 2015 appears to have summed up Ecology's stance on union-related expression in the lobby: "We have a good relationship with the union and the union doesn't want you here." Exh. 6 at 19, lines 1-10; Exh. 1 at 25. Ecology's official position on speech related to labor relations is direct evidence of viewpoint discrimination.

Viewpoint discrimination can also be proven through circumstantial evidence. *See Pittsburgh League of Young Voters Educ. Fund v. Port Auth. of Allegheny Co.*, 653 F.3d 290, 297 (3d Cir. 2011) (noting that "[t]he [plaintiff] coalition is not armed with direct evidence of discrimination," but "[t]his is hardly surprising" given "[t]he government rarely flatly admits it is engaging in viewpoint discrimination"). Thus, "the recitation of a nondiscriminatory rationale is not sufficient standing alone because it could be a cover-up for unlawful discrimination." *Id.*; *see also Cornelius*, 473 U.S. at 811 ("The existence of reasonable grounds . . . will not save a regulation that is in reality a façade for viewpoint-based discrimination.").

Underinclusive enforcement that targets some but not all speakers subject to a rule "raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786, 802 (2011).[4] Suspicion of viewpoint discrimination can also arise "where the viewpoint-

---

[4] *See also Pittsburgh League*, 653 F.3d at 297-98 ("That the Port Authority accepted several noncommercial ads, but rejected the coalition's ad for the stated reason that it was noncommercial, was evidence that the District Court could properly consider as strongly suggesting viewpoint discrimination."); *Ridley v. Massachusetts Bay Transp. Auth.*, 390 F.3d 65, 87 (1st Cir. 2004) ("[W]here the government states that it rejects something because of a certain characteristic, but other things possessing the same characteristic are accepted, this sort of underinclusiveness raises a suspicion that the stated neutral ground for action is meant to shield an impermissible motive.").

Pacific Legal Foundation
255 South King Street, Suite 800
Seattle, Washington 98104
(916) 419-7111

neutral ground is not actually served very well by the specific government action at issue; where, in other words, the fit between means and ends is loose or nonexistent." *Ridley*, 309 F.3d at 87.

Here, an array of evidence points to viewpoint discrimination. Ecology adopted Section 2 of Policy 14-10 as a direct response to Freedom Foundation's attempt to leaflet in 2015. Exh. 9 at 7, lines 13-16. Moreover, Ecology has applied that section against Freedom Foundation while allowing other organizations to promote and solicit for outside organizations in the lobby. For example, several months after section 2 came into effect, Ecology allowed the local transit authority to hold a two-hour "transit fair" in the lobby. Exh. 20. Likewise, Ecology allowed Joy Ride Bikes, a "commercial enterprise" under Policy 14-10, to perform a bike repair demonstration for an hour in the lobby. Exh. 21; *see also* Exh. 14 at 80-81. Ecology's designated representative conceded that Section 2 on its face applies to these events. *See* Exh. 9 at 38-39. Rather than resorting to any written policy that might exempt these outside organizations from Section 2, Ecology has made a post-hoc excuse for this lapse in enforcement by claiming these outside organizations engaged in speech related to Ecology business. *See id.* This underinclusive enforcement, particularly in light of the fact that Ecology adopted Section 2 in response to Freedom Foundation, gives rise to a powerful inference that Ecology has "come up with such a policy solely to defend its decision to reject plaintiff's [speech]." *Ridley*, 390 F.3d at 81.

The poor fit between the exclusion of Freedom Foundation and Ecology's stated interests is also persuasive evidence of viewpoint discrimination. The purported rationales behind Policy 14-10 are to ensure visitors are "treated fairly and consistently when visiting Ecology facilities," manage parking availability, maintain security during meetings and events, and ensure compliance with Executive Policy 15-01. Exh. 8. The exclusion of Freedom Foundation does not further fair and consistent treatment of visitors—indeed, it appears to undermine that purpose. The yearly visit of one or two Freedom Foundation canvassers does not impact parking availability more than the typical flow of visitors allowed to eat at the Ecology cafeteria. While security is an important government interest, a rare visit by Freedom Foundation to quietly hand out information does not

Pacific Legal Foundation
255 South King Street, Suite 800
Seattle, Washington 98104
(916) 419-7111

create any security concern greater than the allowance for regular visitors or other events such as the transit fair, the plant sale, union activities, or a bike-repair demonstration.

Recognizing that the named objectives in Policy 14-10 do not justify excluding Freedom Foundation, Ecology's designated representative also raised a concern over disruption of the workplace. *See* Exh. 9 at 27, lines 11-14. He could not explain, however, why passively handing out flyers is more disruptive than transit fairs, farmers' markets, plant sales, and any number of other events that take place in the lobby. Indeed, some of these approved activities have proven to be disruptive, yet Ecology has continued to allow them. *See, e.g.*, Exh. 19 ("The plant sale made it impossible for reception to hear phones and disturbed the SEA program and exec staff above the lobby."). Given the poor fit between means and end, Ecology has failed to offer a legitimate reason that can rebut the clear impression of viewpoint bias with the adoption and enforcement of Policy 14-10.

**d.   Ecology's Practice of Denying Freedom Foundation Canvassers Access to the Lobby Fails Strict Scrutiny**

A law subject to strict scrutiny must be narrowly tailored to satisfy a compelling government interest. As discussed above, Ecology's speech restrictions are underinclusive and exhibit a sloppy means-end fit, so Ecology cannot satisfy narrow tailoring. *See Republican Party of Minn. v. White*, 536 U.S. 765, 780 (2002) ("[A] law cannot be regarded as protecting an interest of the highest order, and thus as satisfying a restriction on truthful speech, when it leaves appreciable damage to that supposedly vital interest unprohibited.").

Additionally, Ecology policy is not narrowly tailored because there exist less-restrictive alternatives. *See Ashcroft v. ACLU*, 542 U.S. 656, 665-66 (2004) (narrow tailoring requires the government to adopt less restrictive alternatives). Ecology could, for instance, impose reasonable time, place, and manner restrictions. These could include rules that specify locations in the lobby where expression can occur, what times of day, or rules prohibiting masks or putting other reasonable limits on modes of expression. Ecology has already imposed such content-neutral

P.'s Motion for Summ. J. - 20
Case No. 3:18-cv-05548-RBL

Pacific Legal Foundation
255 South King Street, Suite 800
Seattle, Washington 98104
(916) 419-7111

restrictions on fund-raising activities. *See* Exh. 27 at 28, lines 3-5. There is no reason why similar measures cannot satisfy the government's interests regarding visits from outside canvassers.

## II.   Even if the Lobby Is a Limited or Non-Public Forum, Ecology's Practices Still Violate the First Amendment

Ecology's speech restrictions cannot satisfy even the lower bar for regulations in a limited or non-public forum. In such a forum, "any subject-matter or speaker-based limitations must still be reasonable and viewpoint neutral." *Seattle Mideast Awareness Campaign*, 781 F.3d at 499. As discussed above, Ecology's exclusion of Freedom Foundation is not viewpoint-neutral. *See supra* Part I.C. It is not reasonable either.

Reasonableness is gauged "in light of the purpose served by the forum." *Cornelius*, 473 U.S. at 806. The government bears the burden of presenting "evidence that the restriction reasonably fulfills a legitimate need." *Eagle Point Educ. Ass'n*, 880 F.3d at 1105. Several factors bear consideration. First, government managing a limited public forum may not forbid expression that is "compatible with the intended purpose of the property." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 49 (1983).

Second, the government's standard for excluding expression must be "definite and objective" so as "to prevent arbitrary or discriminatory enforcement by [government] officials." *Seattle Mideast Awareness Campaign*, 781 F.3d at 499, 500. Under this standard, if the speech restriction "involves appraisal of facts, the exercise of judgment, and the formation of an opinion" by officials, then "the danger of censorship and of abridgment of our precious First Amendment freedoms is too great to be permitted." *Forsyth County, Ga. v. Nationalist Movement*, 505 U.S. 123, 131 (1992) (internal quotation marks omitted).

This standard arose recently in the Supreme Court's decision in *Minnesota Voters Alliance v. Mansky (MVA)*, 138 S. Ct. 1876 (2018). In *MVA*, the Court struck down a ban on "political badges, political buttons, or other political insignia" at the polling place. *Id.* at 1883. While the Court acknowledged that the polling place was a non-public forum with a need to avoid disruption, it held that this "indeterminate prohibition" was unreasonable because official "discretion must be

Pacific Legal Foundation
255 South King Street, Suite 800
Seattle, Washington 98104
(916) 419-7111

guided by objective, workable standards." *Id.* at 1891. The political apparel ban's insufficient guidance failed "to articulate some sensible basis for distinguishing what may come in from what must stay out." *Id.* at 1888.

Likewise, in *Board of Airport Commissioners of City of Los Angeles v. Jews for Jesus*, the high court rejected a port authority's speech restriction on First Amendment activities in an airport unless the speech was "airport related." *Board of Airport Comm'rs of City of Los Angeles v. Jews for Jesus*, 482 U.S. 569, 576 (1987). That vague qualifier was unreasonable because it gave airport officials "the power to decide in the first instance whether a given activity is airport related," thereby conferring on them a "virtually unrestrained power" in enforcing an "open-ended interpretation." *Id.*

Ecology's "related to government business" exception—which finds no grounding in the actual language of Policy 14-10—is much like the "airport related" speech exception in *Jews for Jesus* that gave "virtually unrestrained power" to enforcers. Ecology testified that this "Ecology-related" speech exception is a "contextual" case-by-case determination. Exh. 27 at 14, lines 12 and 21-24. But in practice, it is so elastic that Ecology officials have decided that speech related to employee "wellness" is related to Ecology business, but speech about employees' constitutional rights is not (unless such speech comes from the union). Exh. 27 at 30-31. And Ecology conceded that labor relations are part of state business yet insisted that Freedom Foundation's expression about workers' rights with regard to the union did not fit within the exception for speech related to Ecology or state business. Exh. 27 at 16-17. Just like *Jews for Jesus*, such an ad hoc exception allows for an unreasonable amount of official discretion. And as with *MVA*, it does not "articulate some sensible basis for distinguishing what may come in from what stay out." *MVA*, 138 S. Ct. at 1888.

Likewise, Ecology's interpretations looking to the speaker's "intent" or whether the speech is "passive" are not "objective, workable standards" needed to guide the exercise of official discretion. *MVA*, 138 S. Ct. at 1891; Exh. 9 at 19, 24 lines 17-19, and 32 lines 22-25.

P.'s Motion for Summ. J. - 22
Case No. 3:18-cv-05548-RBL

Pacific Legal Foundation
255 South King Street, Suite 800
Seattle, Washington 98104
(916) 419-7111

Moreover, Ecology's exclusion of Freedom Foundation does not further any of the purposes behind Policy 14-10. It does not further an interest in security, since members of the public are already allowed open access to the lobby area during business hours. It does not further an interest in fair and consistent treatment of visitors, since some outside organizations are already given preferential access to the lobby for expression.

Certainly, preventing disruption is a recognized government interest, but Ecology's policy does not cite that rationale as a purpose behind Policy 14-10, and Ecology "defeats its own case by permitting" a wide array of expression and other activities in the lobby area, much of it more likely to cause disruption than handing out leaflets. *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 511 (1981) (plurality). *See* Exh. 19 (discussing the disruption caused by lobby plant sale). Ecology's exclusion of Freedom Foundation's leafleting is not reasonable.

## CONCLUSION

Ecology cannot pick and choose among speakers after opening its lobby to the public and a wide range of speech. Freedom Foundation respectfully asks the Court to grant its motion for summary judgment.

DATED:  September 9, 2019.

Respectfully submitted,

By: s/  BRIAN T. HODGES
By: s/  ETHAN W. BLEVINS
Brian T. Hodges, WSBA # 31976
Ethan W. Blevins, WSBA # 48219
Pacific Legal Foundation
255 S. King Street, Suite 800
Seattle, Washington 98104
Telephone: (916) 419-7111
Fax: (916) 419-7747
Email: BHodges@pacificlegal.org
Email: EBlevins@pacificlegal.org

Attorneys for Plaintiff

P.'s Motion for Summ. J. - 23
Case No. 3:18-cv-05548-RBL

Pacific Legal Foundation
255 South King Street, Suite 800
Seattle, Washington 98104
(916) 419-7111

## CERTIFICATE OF SERVICE

I hereby certify that on September 9, 2019, I served the foregoing on the following persons by the means indicated:

| | |
|---|---|
| Emily C. Nelson, Assistant AG<br>Attorney General of Washington<br>Ecology Division<br>P.O. Box 40117<br>Olympia WA 98504-0117<br>Emily.nelson@atg.wa.gov<br>ECYOLYEF@atg.wa.gov | ☒ Email<br>☐ U.S. First Class<br>☐ Legal Messenger<br>☒ E-Service/ECF<br>☐ Other |
| Elizabeth Delay Brown, Assistant AG<br>Attorney General of Washington<br>Ecology Division<br>P.O. Box 40117<br>Olympia WA 98504-0117<br>elizabeb@atg.wa.gov | ☒ Email<br>☐ U.S. First Class<br>☐ Legal Messenger<br>☒ E-Service/ECF<br>☐ Other |

s/ ETHAN W. BLEVINS
Ethan W. Blevins, WSBA # 48219

Attorney for Plaintiff

P.'s Motion for Summ. J. - 24
Case No. 3:18-cv-05548-RBL

Pacific Legal Foundation
255 South King Street, Suite 800
Seattle, Washington 98104
(916) 419-7111