1

2

3

4

5

6                                                    The Honorable Ronald B. Leighton

7

8                    **UNITED STATES DISTRICT COURT**
                  **WESTERN DISTRICT OF WASHINGTON**
9                            **AT TACOMA**

10   FREEDOM FOUNDATION, a                     NO. 3:18-cv-05548-RBL
     Washington State Nonprofit Corporation,
11                                             DEFENDANTS' RESPONSE
                        Plaintiff,             AND CROSS-MOTION FOR
12                                             SUMMARY JUDGMENT
     v.
13                                             NOTE ON MOTION
     WASHINGTON DEPARTMENT OF                  CALENDAR: October 25, 2019
14   ECOLOGY, a Washington State Agency;       Oral Argument Requested
     SANDI STEWART, in her official
15   capacity as Director of Human Resources
     for the Washington Department of
16   Ecology,

17                        Defendants.

18

19

20

21

22

23

24

25

26

DEFENDANTS' RESPONSE AND                              ATTORNEY GENERAL OF WASHINGTON
CROSS-MOTION FOR SUMMARY                                        Ecology Division
JUDGMENT (3:18-cv-05548-RBL)                                     PO Box 40117
                                                            Olympia, WA 98504-0117
                                                                360-586-6770

1

**TABLE OF CONTENTS**

2   I.    INTRODUCTION...................................................................................... 1

3   II.   STATEMENT OF FACTS ........................................................................ 2

4         A.   The Department of Ecology's Lacey Headquarters Building................. 2

5         B.   Ecology Policies and Procedures that Govern Its Facilities ................. 5

6              1.   Executive Policy 7-10 and Executive Procedure 7-10-01 ............... 5

7              2.   Administrative Policy 14-10 ........................................................... 5

8              3.   Executive Policy 15-01 .................................................................... 5

9              4.   The Collective Bargaining Agreement between the State of Washington
10                  and the Washington Federation of State Employees........................ 6

11        C.   Ecology's Interpretation and Application of Its Policies......................... 8

12             1.   Definitions......................................................................................... 8

13             2.   Permissible uses of the lobby under Ecology's policies ................... 9

14                  a.   Employee-sponsored charitable activities ............................... 9

15                  b.   Washington's Commute Trip Reduction Program .................. 10

16                  c.   Bargaining unit employee meetings with WFSE...................... 11

17             3.   Impermissible uses of the lobby under Ecology's policies.............. 11

18        D.   Freedom Foundation's Attempts to Canvas in Ecology's Headquarters Lobby ..... 12

19             1.   December 2015 – Freedom Foundation arrives at Ecology without prior
20                  notice, and without business to conduct with Ecology .................... 13

21             2.   December 2017 – Freedom Foundation refuses to follow Ecology's
                    directions for canvassing at its headquarters building ..................... 15

22  III.  ARGUMENT ......................................................................................... 16

23        A.   Standard of Review.............................................................................. 16

24        B.   The Policies Regulating Speech in Ecology's Lobby Do Not Violate Freedom
                Foundation's First Amendment Rights................................................ 17

25             1.   Ecology's lobby is not a designated public forum ........................... 18

26

a.  Ecology's lobby can only be used for discrete purposes, none of which show an intent to open the lobby as a public forum ...................... 19

b.  Ecology has consistently enforced its policies when managing access to its lobby ............................................................................................. 21

c.  Ecology's lobby is not conducive to a designated public forum ............. 22

2.  Ecology's policies are narrowly tailored and connected to the agency's interests in complying with state law and managing its buildings ................. 23

a.  Ecology's policies are content neutral ...................................................... 24

b.  Ecology's policies further compelling government interests and are narrowly tailored to achieve those interests .............................................. 25

c.  Freedom Foundation refused two alternative channels of communication offered by Ecology .......................................................... 27

3.  Ecology's lobby is a nonpublic forum ........................................................... 28

4.  Ecology's policies are reasonable ................................................................... 30

5.  Ecology's policies are viewpoint neutral ....................................................... 31

IV.  CONCLUSION ........................................................................................................... 35

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

DEFENDANTS' RESPONSE AND
CROSS-MOTION FOR SUMMARY
JUDGMENT (3:18-cv-05548-RBL)

ii

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
PO Box 40117
Olympia, WA 98504-0117
360-586-6770

1

## TABLE OF AUTHORITIES

2

### <u>Cases</u>

3

*Anderson v. Liberty Lobby, Inc.*,
4    477 U.S. 242 (1986) ................................................................ 16

5

*City of Madison, Joint School District No. 8 v. Wisconsin Emp't Relations Comm'n*
6    429 U.S. 167 (1976) ................................................................ 33

7   *Clark v. Cmty. for Creative Non-Violence*,
     468 U.S. 288 (1984) ............................................................ 24, 28

8

*Cornelius v. NAACP Legal Def. and Educ. Fund, Inc.*,
9    473 U.S. 788 (1985) ......................................... 1, 17, 18, 20, 28, 29, 30

10

*Families Achieving Indep. & Respect v. Nebraska Dep't of Soc. Servs.*,
11    111 F.3d 1408 (8th Cir. 1997) ................................................ 23, 29

12  *Greer v. Spock*,
     424 U.S. 828 (1976) ............................................................ 22, 29
13

14  *High Tech Gays v. Def. Indus. Sec. Clearance Office*,
     895 F.2d 563 (9th Cir. 1990) ..................................................... 17

15

*Hopper v. City of Pasco*,
16    241 F.3d 1067 (9th Cir. 2001) .................................................... 20

17  *Int'l Soc. For Krishna Consciousness, Inc. v. Lee*,
     505 U.S. 672 (1992) ................................................ 17, 23, 26, 28, 31
18

19  *Lamb's Chapel v. Ctr. Moriches Union Free School Dist.*,
     508 U.S. 384 (1993) ............................................................... 30
20

21  *Make the Road by Walking, Inc. v. Turner*,
     378 F.3d 133 (2nd Cir. 2004) .................................................. 29, 34

22

*Members of City Coun. of City of Los Angeles v. Taxpayers for Vincent*,
23    466 U.S. 789 (1984) ............................................................... 25

24  *Minnesota Voters All. v. Mansky*,
     138 S. Ct. 1876 (2018) ............................... 1, 17, 18, 20, 21, 28, 29, 30
25

26

DEFENDANTS' RESPONSE AND
CROSS-MOTION FOR SUMMARY
JUDGMENT (3:18-cv-05548-RBL)

iii

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
PO Box 40117
Olympia, WA 98504-0117
360-586-6770

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n,*
    460 U.S. 37 (1983) ................................................ 17, 18, 19, 29, 30, 31, 32, 34

*Pittsburgh League of Young Voters Educ. Fund v. Port Auth. of Allegheny Co.,*
    653 F.3d 290 (3d Cir. 2011) ............................................................................ 34

*Preminger v. Principi,*
    422 F.3d 815 (9th Cir. 2005) ............................................................. 18, 23, 29

*Reed v. Town of Gilbert, Ariz.,*
    135 S. Ct. 2218 (2015) ............................................................................ 24, 25

*Seattle Mideast Awareness Campaign v. King Cty.,*
    781 F.3d 489 (9th Cir. 2015) ................................................................... 19

*SmithKline Beecham Corp. v. Abbott Labs.,*
    740 F.3d 471, (9th Cir. 2014) ................................................................... 17

*U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, AFL-CIO,*
    413 U.S. 548 (1973) ................................................................................... 20

*U.S. v. Albertini,*
    472 U.S. 675 (1985) ........................................................................... 26, 27

*U.S. v. Grace,*
    461 U.S. 171 (1983) ............................................................................... 1, 31

*U.S. v. Kokinda,*
    497 U.S. 720 (1990) ................................................................................. 23

*U.S. v. Gilbert,*
    920 F.2d 878 (11th Cir. 1991) ................................................................... 29

*Ward v. Rock Against Racism,*
    491 U.S. 781 (1989) .......................................................................... 24, 26

**Statutes**

Wash. Rev. Code. § 41.04.750 (2018) ............................................................... 16

Wash. Rev. Code § 41.04.033 (2018) ............................................................... 22

Wash. Rev. Code § 41.04.0331 (2018) ............................................................... 9

Wash. Rev. Code § 41.06 ......................................................................................... 7

Wash. Rev. Code § 41.80 ......................................................................................... 6

Wash. Rev. Code § 41.80.005(2) (2018) ............................................................. 6, 22

Wash. Rev. Code § 41.80.010(1) (2018) .................................................................. 7

Wash. Rev. Code § 41.80.020(1) (2018) .................................................................. 7

Wash. Rev. Code § 41.80.070(1) (2018) .................................................................. 7

Wash. Rev. Code § 41.80.110(1)(e) (2018) .............................................................. 7

Wash. Rev. Code § 43.21A.020 (2018) .................................................................... 2

Wash. Rev. Code § 70.94.521 (2018) ................................................................. 10, 22

## Rules

Fed. R. Civ. P. 56 .................................................................................................... 2

Fed. R. Civ. P. 56(a) .............................................................................................. 16

## Regulations

Wash. Admin. Code § 434-750-020 (2018) ......................................................... 9, 22

## Other Authorities

About Us – Washington State Dep't of Ecology
https://ecology.wa.gov/About-us .............................................................................. 2

Contact us – Washington State Dep't of Ecology
https://ecology.wa.gov/About-us/Get-to-know-us/Contact-us#SWRO ....................... 2

Collective bargaining agreements – Office of Financial Management
https://ofm.wa.gov/state-human-resources/labor-relations/collective-bargaining-agreements ... 6

*State-Ecology*, PERC No. 8968 – PSRA
(Pub. Emp't Relations Comm'n June 9, 2005) .......................................................... 7

*State-Ecology*, PERC No. 12956 – PSRA
(Pub. Emp't Relations Comm'n Dec. 21, 2018) ........................................................ 7

DEFENDANTS' RESPONSE AND
CROSS-MOTION FOR SUMMARY
JUDGMENT (3:18-cv-05548-RBL)

v

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
PO Box 40117
Olympia, WA 98504-0117
360-586-6770

# I.    INTRODUCTION

The First Amendment does not require a government agency to "freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." *Minnesota Voters All. v. Mansky*, 138 S. Ct. 1876, 1885 (2018) (quoting *Cornelius v. NAACP Legal Def. and Educ. Fund, Inc*., 473 U.S. 788, 800 (1985)). The government, like a private property owner, has the right to ensure that the property under its control is used for the purpose for which it is dedicated. *Cornelius*, 473 U.S. at 800. "There is little doubt that . . . the government may ban the entry on to all public property that is not a 'public forum' of all persons except those who have legitimate business on the premises." *U.S. v. Grace*, 461 U.S. 171, 178 (1983).

With this lawsuit, Plaintiff Freedom Foundation seeks to turn these bedrock principles of First Amendment law on their heads. The Foundation claims that Defendant Washington State Department of Ecology's longstanding policy of prohibiting solicitation or promotion in the lobby of Ecology's Lacey headquarters violates the Foundation's First Amendment rights. But Freedom Foundation's claim fails, as a matter of law, at every step of its analysis. The Foundation cannot show that Ecology's policies demonstrate the requisite intent to turn its lobby into a public forum, so instead the Foundation nitpicks Ecology's policies and feigns confusion over what it means to have "legitimate business on the premises." Lacking any direct evidence of bias or viewpoint discrimination, Freedom Foundation resorts to "circumstantial evidence" that consists of half-truths about Ecology's application of its policies, and a gross mischaracterization of the offhand remark of a frustrated Ecology-contracted security guard. For these reasons, Freedom Foundation's request for summary judgment should be denied.

In fact, the undisputed evidence shows that Ecology's lobby is, and always has been, a nonpublic forum, governed by reasonable, viewpoint-neutral regulations. For this reason, and

DEFENDANTS' RESPONSE AND
CROSS-MOTION FOR SUMMARY
JUDGMENT (3:18-cv-05548-RBL)

1

ATTORNEY GENERAL OF
WASHINGTON
Ecology Division
PO Box 40117
Olympia, WA 98504-0117
360-586-6770

pursuant to Federal Rule of Civil Procedure 56, Defendants Washington State Department of

Ecology and its Director of Human Resources Sandi Stewart (collectively, Ecology) move for

summary judgment dismissal of Freedom Foundation's First Amendment claim. No genuine

issues of material fact exist, and Ecology is entitled to judgment as a matter of law.

## II.      STATEMENT OF FACTS

### A.      The Department of Ecology's Lacey Headquarters Building

The Department of Ecology is a Washington State agency whose mission is to

"[p]rotect, preserve, and enhance the environment for current and future generations."

*See* About Us – Washington State Dep't of Ecology, https://ecology.wa.gov/About-us (last

visited Sept. 27, 2019). The Legislature created Ecology to manage and develop Washington

State's "air and water resources in an orderly, efficient, and effective manner, and to carry out

a coordinated program of pollution control" to protect those resources. Wash. Rev. Code §

43.21A.020 (2018).

Ecology's statewide headquarters is located at 300 Desmond Drive SE, in Lacey,

Washington. The building is three stories, 323,000 gross square-feet, and is open for business

from 8:00 a.m. to 5:00 p.m., Monday through Friday. Declaration of Emily C. Nelson

(Nelson Decl.) Ex. 1; Contact us – Washington State Dep't of Ecology,

https://ecology.wa.gov/About-us/Get-to-know-us/Contact-us#SWRO (last visited

Sept 29, 2019). The building houses approximately 900 Ecology employees, in addition to staff

for three tenant agencies: the U.S. Environmental Protection Agency, the Washington State

Conservation Commission, and Pollution Liability Insurance Agency. Nelson Decl. Ex. 3

at 17:15–18. Desmond Drive runs north to south on the west side of Ecology's headquarters.

Nelson Decl. Ex. 4. A one-way driveway, extending perpendicular from Desmond Drive,

traverses the entire length of the north side of the building. *Id.* The driveway leads to staff and

DEFENDANTS' RESPONSE AND
CROSS-MOTION FOR SUMMARY
JUDGMENT (3:18-cv-05548-RBL)

2

ATTORNEY GENERAL OF
WASHINGTON
Ecology Division
PO Box 40117
Olympia, WA 98504-0117
360-586-6770

visitor parking east of the headquarters building, curves around, and then returns to Desmond Drive. Nelson Decl. Ex. 4.

Ecology headquarters has one visitor entrance and exit on the north side of the building, in front of a large square patio area. Nelson Decl. Exs. 1, 4, and 5 at 1. The visitor entrance opens into the headquarters lobby. Nelson Decl. Ex. 5 at 2–3. Both the north and south sides of the lobby are floor-to-ceiling glass windows. Nelson Decl. Ex. 5 at 2–3, 5. The lobby is an atrium that is open to the building's ceiling. The two floors above the lobby are open to the atrium, such that sound from the lobby carries upward and into the workspaces on those floors. Nelson Decl. Ex. 5 at 3–6.

There are reception and security desks adjacent to the visitor entrance, and a placard in front of the entrance directs visitors to sign in upon arrival. Nelson Decl. Ex. 5 at 7; *see also* Declaration of Matthew Hayward in Support of Plaintiff's Motion for Summary Judgment (Hayward Decl.) Ex. 16 at 2. Visitors must also obtain a visitor's badge and provide their name, the agency or company they represent, the employee they are visiting or public meeting they are attending, time of arrival, badge number from the visitor's badge they receive, and time of departure. Nelson Decl. Ex. 3 at 15:8–11, Ex. 10 at 1–2, Ex. 6. By requiring visitors to sign in, Ecology can determine their purpose for being present in the building, and account for building occupants in the event of an emergency. Nelson Decl. Ex. 3 at 15:12–16:6, Ex. 9 at 2.

On the west end of the lobby, locked glass doors secured by keycard access separate the majority of Ecology's first-floor workspace from the lobby. Nelson Decl. Ex. 2, Ex. 3 at 30:1–4. Access to the workspace requires an Ecology-issued keycard, and an Ecology employee (or one of its tenant's employees) must escort all visitors entering the area.[1] Nelson Decl. Ex. 3 at 15:8–17, Ex. 10 at 2. The previous workspace for Ecology's Sustainability

---

[1] When Freedom Foundation attempted to canvass at Ecology in 2015, the locked glass doors had not been installed yet. Nelson Decl. Ex. 3 at 29:6–25.

DEFENDANTS' RESPONSE AND
CROSS-MOTION FOR SUMMARY
JUDGMENT (3:18-cv-05548-RBL)

3

ATTORNEY GENERAL OF
WASHINGTON
Ecology Division
PO Box 40117
Olympia, WA 98504-0117
360-586-6770

1   Coordinator[2] is in a cubicle in a sunken part of the southwest corner of the lobby. Declaration

2   of Jason Norberg in Support of Defendants' Response and Cross-Motion for Summary

3   Judgment (Norberg Decl.) ¶ 5. There are four other sunken areas with glass cases displaying

4   artifacts related to the history of Ecology and its work. Nelson Decl. Ex. 1, Ex. 5 at 9. There

5   are also seating areas for visitors and Ecology staff to use while waiting to conduct

6   Ecology-related business. *See* Nelson Decl. Ex. 5 at 3–6.

7           The parking structure and parking lots for employees and visitors are located on the

8   east side of the headquarters building. Nelson Decl. Ex. 4. Employees enter the building from

9   the parking structure, through a keycard secured entrance that leads into the east end of the

10  lobby. Employees then must pass through the lobby to access the workspaces on the west end

11  of the lobby. *See* Nelson Decl. Ex. 1. Conversely, Ecology employees who work in the west

12  end workspaces must also pass through the lobby to access the cafeteria and meeting rooms in

13  the eastern portion of the building. *Id.*

14          Ecology allows visitors to patronize the cafeteria inside the headquarters building,

15  provided they sign in with the receptionist, and comply with Ecology's policies. Nelson Decl.

16  Ex. 10. The cafeteria space is accessed by passing through the east end of the lobby, and then

17  down a long hallway. *See* Nelson Decl. Ex. 5 at 8. Thus, visitors wishing to access the cafeteria

18  must do so by passing through the lobby. Nelson Decl. Ex. 3 at 11:10–16, 20–24. Currently,

19  the cafeteria is closed due to the lack of a cafeteria vendor. Norberg Decl. ¶ 4.

20          The purpose for the entire headquarters building, and the employees it houses, is to

21  conduct the work required of Ecology for the state of Washington. Nelson Decl. Ex. 7

22  at 19:5–8. Accordingly, visitors are not allowed to loiter in the lobby, nor are they able to

23  reserve it for private use. Nelson Decl. Ex. 3 at 10:25–11:9, Ex. 9 at 2. Only Ecology

24  employees and tenants have the ability to request to use the lobby for meetings or events, and

25

26  _____
    [2] The Sustainability Coordinator's workspace is now located in the basement of the headquarters
    building, but the cubicle remains available for employee use. Norberg Decl. ¶ 5.

4

ATTORNEY GENERAL OF
WASHINGTON
Ecology Division
PO Box 40117
Olympia, WA 98504-0117
360-586-6770

only if such uses are consistent with state ethics laws and Ecology policies. Nelson Decl. Ex. 3 at 11:4–9, Ex. 8 at 1, Ex. 11 at 1.

**B.      Ecology Policies and Procedures that Govern Its Facilities**

**1.      Executive Policy 7-10 and Executive Procedure 7-10-01**

In order to ensure the safety and security of its facilities and their occupants, Ecology must know who is present in its buildings, and for what purpose. Nelson Decl. Ex. 3 at 15:12–16:6, Ex. 7 at 9:13–17. Thus, Executive Policy 7-10 and Executive Procedure 7-10-01 outline the visitor sign-in requirements, and describe security measures for all Ecology facilities. Nelson Decl. Exs. 9 and 10. The policy makes clear the need for visitors to be escorted if they are attending a meeting in a space that is in a secure work area. Nelson Decl. Ex. 3 at 27:20–28:10.

**2.      Administrative Policy 14-10**

Administrative Policy 14-10 generally governs the use of Ecology facilities, and has been in place since the 1990s. The primary purposes of Policy 14-10 are to establish standards for the use of Ecology facilities that will ensure: 1) outside agencies and visitors are treated fairly and consistently when visiting Ecology facilities, 2) parking is managed so building occupants and clients have adequate parking space, 3) facilities are properly secured during meetings and events occurring on site, and 4) compliance with Ecology Executive Policy 15-01 prohibiting the private use of state resources. Nelson Decl. Ex. 7 at 8:22–9:6, Ex. 11. Relevant in this case, Section 2 of Policy 14-10 prohibits visitors from using Ecology facilities "to promote or solicit for an outside organization or group. The only exceptions are public hearings or meetings held according to [Policy 14-10] or activities approved as a charitable activity according to Policy 15-01." Nelson Decl. Ex. 11 at 1.

**3.      Executive Policy 15-01**

The primary purpose of Executive Policy 15-01 is to ensure compliance with Washington State ethics laws, and to describe Ecology's position and requirements regarding

DEFENDANTS' RESPONSE AND
CROSS-MOTION FOR SUMMARY
JUDGMENT (3:18-cv-05548-RBL)

5

ATTORNEY GENERAL OF
WASHINGTON
Ecology Division
PO Box 40117
Olympia, WA 98504-0117
360-586-6770

the use of state resources. Nelson Decl. Ex. 12 at 7:11–15, Ex. 8. This policy has been in place since at least the early 1990s. Nelson Decl. Ex. 3 at 31:3–7. It prohibits the misuse of state resources by employees, and articulates Ecology's expectations. Nelson Decl. Ex. 12 at 8:15–17. Although the Policy is directed towards employees, it describes situations that would constitute a violation of Washington State ethics law as it pertains to anyone's use of state resources. Nelson Decl. Ex. 12 at 7:22–24, Ex. 8. Ecology bases its interpretation of Policy 15-01 on Washington State Executive Ethics Board advisory opinions, and other guidance provided by the State Executive Ethics Board. Nelson Decl. Ex. 12 at 32:23–25.

Ecology employees are prohibited from using or allowing any state resources to be used for any personal gain. Nelson Decl. Ex. 12 at 10:3–13, Ex. 8 at 2. This includes "[s]upporting, promoting, or soliciting for an outside organization or group, unless allowed by law and authorized by Ecology's director or designee." Nelson Decl. Ex. 8 at 2.

### 4. The Collective Bargaining Agreement between the State of Washington and the Washington Federation of State Employees

In addition to Ecology's internal policies, the Collective Bargaining Agreement (CBA)[3] between the State of Washington and the Washington Federation of State Employees (WFSE), the exclusive bargaining representative of certain Ecology employees, governs WFSE's use of, and access to, Ecology's facilities.

The Department of Ecology is a public employer covered by Chapter 41.80 RCW. As such, Ecology has a duty to bargain with the exclusive bargaining representative of its employees. Wash. Rev. Code § 41.80.005(2) (2018). "Collective bargaining" means the performance of the mutual obligation of the representatives of the employer and the exclusive bargaining representative to meet at reasonable times and to bargain in good faith in an effort to reach agreement with respect to certain subjects. *Id.* Primarily, except as

---

[3] Ecology has provided relevant excerpts from the 2017–2019 CBA, which was in effect when the Plaintiffs filed their Complaint. For the current CBA, or un-excerpted copy of the 2017–2019 CBA, see https://ofm.wa.gov/state-human-resources/labor-relations/collective-bargaining-agreements.

DEFENDANTS' RESPONSE AND
CROSS-MOTION FOR SUMMARY
JUDGMENT (3:18-cv-05548-RBL)

6

ATTORNEY GENERAL OF
WASHINGTON
Ecology Division
PO Box 40117
Olympia, WA 98504-0117
360-586-6770

1   otherwise provided by law, "the matters subject to bargaining include wages, hours, and

2   other terms and conditions of employment, and the negotiation of any question arising under

3   a collective bargaining agreement" between the parties. Wash. Rev. Code § 41.80.020(1)

4   (2018).

5       The state Public Employment Relations Commission (PERC) decides the appropriate

6   unit for certification in "each application for certification as an exclusive bargaining

7   representative." Wash. Rev. Code § 41.80.070(1) (2018). In this case, PERC certified WFSE

8   in June 2005 as the exclusive bargaining representative of "all employees of the Washington

9   State Department of Ecology covered under RCW 41.06, excluding supervisors, confidential

10  employees, WMS employees, exempt employees and internal auditors."[4] *See State-Ecology*,

11  PERC No. 8968 – PSRA (Pub. Emp't Relations Comm'n June 9, 2005). Because these

12  employees comprise a bargaining unit represented by WFSE, Ecology has a legal duty to

13  bargain with the union on issues affecting those employees. Failure to recognize the

14  exclusive bargaining representative would constitute an unfair labor practice on the part of

15  Ecology. Wash. Rev. Code § 41.80.110(1)(e) (2018).

16      The Washington State Office of Financial Management (OFM) is responsible for

17  negotiating labor relations with WFSE at the state level. Wash. Rev. Code § 41.80.010(1)

18  (2018); Nelson Decl. Ex. 12 at 15:3–6. As a state employer, Ecology administers the CBA in

19  accordance with how it has been negotiated by OFM, and with oversight and guidance from

20  OFM. Nelson Decl. Ex. 12 at 15:6–12. Relevant here, Article 39 of the CBA provides that

21  WFSE staff representatives may have access to Ecology's facilities, in accordance with

22  Ecology's internal policies, to conduct representational activities with bargaining unit

23  employees. Nelson Decl. Ex. 22 at 17–18, 20, Ex. 3 at 51:4–12.

24  _____

25      [4]In December 2018, PERC additionally certified WFSE as the exclusive bargaining representative of "all
    Washington Conservation Corps Supervisors at the Department of Ecology, excluding nonsupervisors, WMS
26  employees, and all other employees." *See State-Ecology*, PERC No. 12956 – PSRA (Pub. Emp't Relations
    Comm'n Dec. 21, 2018).

DEFENDANTS' RESPONSE AND                    7                    ATTORNEY GENERAL OF
CROSS-MOTION FOR SUMMARY                                               WASHINGTON
JUDGMENT (3:18-cv-05548-RBL)                                          Ecology Division
                                                                      PO Box 40117
                                                                 Olympia, WA 98504-0117
                                                                      360-586-6770

C.    **Ecology's Interpretation and Application of Its Policies**

Policy 14-10 and Policy 15-01 expressly incorporate each other by reference. *See* Nelson Decl. Ex. 11 at 1, Ex. 8 at 1. Read together, the policies restrict the use of Ecology facilities to Ecology business purposes, subject to a few exceptions. *Id.* Although the policies have always referenced each other, in April 2017, Ecology added Section 2 to Policy 14-10 to make the prohibition of promotion or solicitation by outside organizations as explicit as it had been in Policy 15-01. *See* Nelson Decl. Exs. 13, 14 and 16. As a result, Policy 14-10 now reflects what has consistently been Ecology's interpretation and execution of Policy 14-10 since its establishment in 1998. Nelson Decl. Ex. 7 at 8:8–12. Additionally, as shown below, Freedom Foundation's unannounced visit to Ecology in 2015 demonstrated a need to make the connection between the two policies more prominent. Nelson Decl. Ex. 7 at 7:13–18.

1.    **Definitions**

Under Ecology's policies, "promote" means to "provide information, interact with," or "to bring attention and/or awareness to." *See respectively* Nelson Decl. Ex. 7 at 15: 9–13, Ex. 12 at 10:24–11:7. Ecology interprets "solicit" in conjunction with "promotion," such as by providing leaflets or flyers "for the purposes of engaging or getting action or interaction with someone else." *See respectively* Nelson Decl. Ex. 7 at 15:17–20, Ex. 12 at 11:8–10. Ecology defines an "outside organization" as any person or organization that is not: 1) part of Ecology, 2) a tenant in an Ecology owned or leased facility, 3) the certified exclusive bargaining representatives of Ecology employees, or 4) an approved charitable organization under Executive Policy 15-01. Nelson Decl. Ex. 7 at 15:25–16:6.

Fundamentally, an "outside organization" is any group that is not connected to Ecology's work. Nelson Decl. Ex. 12 at 11:11–18. If the purpose of an outside organization's presence at an Ecology facility is not to engage in a business relationship or transaction with Ecology, then the outside organization cannot use state resources. Nelson Decl. Ex. 12 at 36:7–25. Ecology does not distinguish between commercial and noncommercial

8

ATTORNEY GENERAL OF
WASHINGTON
Ecology Division
PO Box 40117
Olympia, WA 98504-0117
360-586-6770

organizations when assessing whether they are an "outside organization." Nelson Decl. Ex. 7

at 14:11–15; *see, e.g.,* Nelson Decl. Ex. 12 at 35:23–36:25.

### 2.   Permissible uses of the lobby under Ecology's policies
#### a.   Employee-sponsored charitable activities

One of the most frequent permissible uses of the lobby is for charitable activities. An

Ecology employee must sponsor all charitable activities, and the employee must complete

Ecology Form 010-80 to obtain approval for the activity. Nelson Decl. Ex. 8 at 3–4, Ex. 24.

Ecology Human Resources Director Sandi Stewart is responsible for reviewing and

approving or denying the requests. An approved charitable activity does not have to be

connected to Ecology's thematic focus as an agency (i.e., conservation or environmental

issues). Nelson Decl. Ex. 12 at 22:14–17.

The majority of the charitable activities that occur at Ecology are part of the

Washington State Combined Fund Drive (CFD). The CFD is Washington's workplace giving

program for active and retired state employees. It is the only authorized solicitation of

Washington state employees in the workplace. *See* Wash. Admin. Code § 434-750-020;

Wash. Rev. Code § 41.04.0331. State employees can donate to the CFD, which disperses

funds to a number of approved charities. Nelson Decl. Ex. 3 at 67:2–9.

A committee of Ecology employees organize activities at the agency for the CFD's

annual campaign, with the proceeds from those activities going to CFD charities. Nelson

Decl. Ex. 3 at 67:21–68:4, Ex. 12 at 20:15–23. Ecology CFD volunteers will organize

various events, held in multiple locations in the headquarters building, to educate fellow

employees about different CFD charities, or to raise money for Ecology's collective donation

to the CFD. *Id.* Past CFD events held in Ecology's lobby have included a pet photo contest

and a "farmer's market," where Ecology employees have donated food, crafts, plants, and

other items for purchase by other employees. *See respectively* Nelson Decl. Ex. 26, Ex. 24,

and Ex. 3 at 69:17–23. These events are only advertised to Ecology employees, but if an

DEFENDANTS' RESPONSE AND
CROSS-MOTION FOR SUMMARY
JUDGMENT (3:18-cv-05548-RBL)

9

ATTORNEY GENERAL OF
WASHINGTON
Ecology Division
PO Box 40117
Olympia, WA 98504-0117
360-586-6770

1   authorized visitor were present during an event and wished to participate, Ecology would

2   allow it. Nelson Decl. Ex. 3 at 70:21–71:2.

3          Ecology employees have also formed an internal Sustainability Committee, which

4   maintains a vegetable garden on the grounds of Ecology's headquarters. Nelson Decl. Ex. 3

5   at 64:21–65:1, Ex. 15. The Sustainability Committee donates all food grown in the garden to

6   the Thurston County Food Bank, which is an approved CFD charity. Nelson Decl. Ex. 3 at

7   64:22–65:1. To raise money for gardening supplies, the Sustainability Committee hosts a

8   plant sale in Ecology's lobby. During the plant sale, Ecology has allowed the Food Bank to

9   distribute information about the organization to Ecology employees to inform them about the

10  final destination of the food grown in the garden. *Id.*

11              **b.    Washington's Commute Trip Reduction Program**

12         In addition to employee-sponsored charitable activities, Ecology's policies also allow

13  events related to Washington's Commute Trip Reduction Program to occur in its facilities.

14  Nelson Decl. Ex. 12 at 11:21–12:3. The Legislature requires all state agencies, including

15  Ecology, to implement programs that reduce single-occupant vehicle commuting by state

16  employees. Wash. Rev. Code § 70.94.521 (2018).

17         As part of the state Commute Trip Reduction Program, Ecology has employed a

18  Sustainability and Transportation Specialist to organize events to educate Ecology employees

19  about their different options for commuting to work. Norberg Decl. ¶ 5; Nelson Decl. Ex. 7 at

20  35:19–36:3. These events have featured Intercity Transit, which provides information about

21  vanpools, bus lines, and other forms of public transport in the South Puget Sound region.

22  Nelson Decl. Ex. 3 at 74:12–17. Additionally, to support those employees who commute by

23  bicycle, Ecology has also allowed Joy Ride Bikes, a local bike shop, to hold a bike repair and

24  maintenance demonstration for Ecology employees in the lobby. *Id.* at 79:22–80:3,

25  80:10–81:1. Ecology would review any information provided by Joy Ride Bikes to ensure it

26  was connected to Ecology's commute trip reduction program. Nelson Decl. Ex. 7 at 41:2–9.

DEFENDANTS' RESPONSE AND
CROSS-MOTION FOR SUMMARY
JUDGMENT (3:18-cv-05548-RBL)

10

ATTORNEY GENERAL OF
WASHINGTON
Ecology Division
PO Box 40117
Olympia, WA 98504-0117
360-586-6770

These organizations' participation is permissible under Ecology's policies because they help Ecology inform its employees about the state Commute Trip Reduction Program. *Id.* at 39:23–40:3.

          **c.**      **Bargaining unit employee meetings with WFSE**

Ecology also allows its bargaining unit employees to meet with WFSE representatives in the lobby of Ecology's headquarters, among other places in the building, provided all meetings comport with Ecology's policies and the CBA. Nelson Decl. Ex. 3 at 53:5–8. Ecology and WFSE have bargained additional terms and conditions that must be met before these meetings can occur. Nelson Decl. Ex. 20 at 3–4. These conditions were put in place in September 2015. *Id.* The use of lobby space is requested either by an Ecology bargaining unit employee, or a WFSE representative, or both. *Id.* The meeting requestor must describe the purpose and subject of the meeting before receiving approval from either Ecology's labor relations manager or Ecology Human Resources Director Sandi Stewart. *Id.*

As the exclusive bargaining representative of Ecology employees, WFSE is not considered an outside organization under Ecology's policies to the extent it engages in representational activities on behalf of Ecology employees. Nelson Decl. Ex. 3 at 53:16–24, Ex. 12 at 15:13–16. However, WFSE is prohibited from using Ecology facilities for union organizing, internal union business, advocating for or against the union in an election, or any other purpose prohibited by the state Executive Ethics Board. Nelson Decl. Ex. 17 at 2–3.

        **3.**      **Impermissible uses of the lobby under Ecology's policies**

As discussed above, Ecology's policies generally prohibit the use of its facilities by outside organizations or groups, both commercial and noncommercial.. For example, Ecology rejected an attempt by its former cafeteria food service provider to hold a tasting with Olympia Coffee Roasting Company in Ecology's lobby. Nelson Decl. Ex. 3 at 77:8–19, 78:6–25. The vendor organized the tasting to get feedback from Ecology employees on the type of coffee the vendor should sell in the cafeteria. *Id.* at 77:8–19. Ecology directed the vendor to hold the

DEFENDANTS' RESPONSE AND
CROSS-MOTION FOR SUMMARY
JUDGMENT (3:18-cv-05548-RBL)

11

ATTORNEY GENERAL OF
WASHINGTON
Ecology Division
PO Box 40117
Olympia, WA 98504-0117
360-586-6770

tasting in the cafeteria, which the vendor had a contract to use for such purposes, rather than the lobby, as such use would constitute a violation of Ecology's policies. *Id.* at 78:17–19.

Similarly, Ecology's policies do not allow outside organizations or groups to canvass, leaflet, protest, or demonstrate inside its facilities. *See* Nelson Decl. Ex. 4, Ex. 5 at 1; Norberg Decl. ¶ 12. Instead, such activities must occur on the sidewalks along Desmond Drive, or in the outdoor plaza directly in front of the building. *Id.* For example, on September 23, 2019, the Sierra Club held a rally at Ecology headquarters to protest two proposed industrial projects that must obtain permits from Ecology. Norberg Decl. ¶ 6. Ecology learned of the planned rally via social media, and contacted Sierra Club ahead of time to communicate logistics, and the acceptable location and activities of rally participants. *Id.* at ¶ 7, Ex. 23. Because of the large number of participants (approximately 100), Ecology allowed the group to stand in the plaza in front of its headquarters, and only allowed participants to enter the building in small groups to use the restroom. Norberg Decl. at ¶¶ 9–11.

**D.**     **Freedom Foundation's Attempts to Canvas in Ecology's Headquarters Lobby**

In December 2015 and December 2017, the Freedom Foundation attempted to canvas and leaflet in the lobby of the Ecology headquarters building. The Foundation defines canvassing and leafletting as an attempt to make face-to-face contact with people who might find their information relevant. Nelson Decl. Ex. 18 at 11:4–11. In their visits to Ecology in December 2015 and December 2017, Freedom Foundation canvassers held large posters and attempted to give Ecology employees brochures with information about their rights, how the union spends their dues, and a form for the employee to "opt-out" of their union membership. *See* Hayward Decl. Exs. 3, 4, and 11.

Like Sierra Club and Olympia Coffee Roasting Company, the Freedom Foundation is considered an outside organization under Ecology's policies. Nelson Decl. Ex. 11 at 1; Ex. 7 at 13:14–25. As such, the Freedom Foundation is not permitted to canvass in Ecology's lobby. Nelson Decl. Ex. 7 at 17:3–11.

DEFENDANTS' RESPONSE AND
CROSS-MOTION FOR SUMMARY
JUDGMENT (3:18-cv-05548-RBL)

12

ATTORNEY GENERAL OF
WASHINGTON
Ecology Division
PO Box 40117
Olympia, WA 98504-0117
360-586-6770

1. **December 2015 – Freedom Foundation arrives at Ecology without prior notice, and without business to conduct with Ecology**

In December 2015, two Freedom Foundation canvassers, one dressed in a Santa Claus costume with a hat and large fake beard, entered the lobby of Ecology's headquarters to distribute Freedom Foundation flyers and "opt out" forms to Ecology employees. Nelson Decl. Ex. 27 at 13:20–14:3, 14:17–22. The canvassers, Matthew Hayward and Elmer Callahan, did not contact Ecology ahead of time to request permission to canvass on the agency's property. *Id.* at 31:18–22. Mr. Hayward does not believe he needs permission. *Id.* at 61:4–6. This surprised Ken Nasworthy, Ecology's security guard[5] on duty at the time of the visit, because Ecology does not usually receive solicitors, and protestors typically let Ecology know they are coming in advance. Nelson Decl. Ex. 28 at 9:3–11; Norberg Decl. ¶ 6.

Initially, Mr. Nasworthy misunderstood, and thought the canvassers were with WFSE. Nelson Decl. Ex. 28 at 13:5–12, 13:20–14:2, Ex. 27 at 27:19–28:15. Mr. Nasworthy told the canvassers to wait in the lobby reception area while he went downstairs to consult with Ecology's Building and Security Manager, Steve Fry, on whether, and where, the canvassers could hand out flyers. Nelson Decl. Ex. 28 at 9:11–15, 13:20–22.

While Mr. Nasworthy was gone, Mr. Callahan, the canvasser dressed as Santa Claus, entered Ecology employee workspace on the west end of the lobby, and began attempting to distribute fliers. Nelson Decl. Ex. 27 at 25:4–6. In 2015, there were no secured doors between the lobby and the first floor office area, but there was a sign stating visitors required an escort to be in the area. Nelson Decl. Ex. 2, Ex. 3 at 29:6–25. Sally Toteff, Ecology's Director for the Southwest Regional Office, saw Mr. Callahan walking unescorted through

---

[5] Mr. Nasworthy is a contract security guard, employed by Puget Sound Security. His primary duties include scheduling and supervising other guards, providing information to the client, and taking care of security issues. Nelson Decl. Ex. 28 at 6:14–7:14.

DEFENDANTS' RESPONSE AND
CROSS-MOTION FOR SUMMARY
JUDGMENT (3:18-cv-05548-RBL)

13

ATTORNEY GENERAL OF
WASHINGTON
Ecology Division
PO Box 40117
Olympia, WA 98504-0117
360-586-6770

1   the area. Declaration of Sally Toteff in Support of Defendants' Response and Cross-Motion

2   for Summary Judgment (Toteff Decl.) ¶ 5. Ms. Toteff was concerned, as she could not

3   determine whether the costumed person was an Ecology employee. *Id.* at ¶ 7. With the

4   assistance of another nearby employee, Ms. Toteff approached Mr. Callahan, and asked

5   whom he was in the building to see. *Id.* at ¶ 9. When Mr. Callahan could not identify an

6   employee or why he was in an employee-only area, Ms. Toteff and her co-worker walked

7   Mr. Callahan back to security. *Id.* Mr. Nasworthy then told the canvassers that they would

8   need to canvass outside. Nelson Decl. Ex. 27 at 25:7–17.

9       The canvassers called Freedom Foundation staff attorney David Dewhirst, who

10   arrived at Ecology headquarters along with two other individuals who filmed the interaction.

11   Nelson Decl. Ex. 25, Ex. 28 at 16:13–17:2. Mr. Dewhirst and Mr. Nasworthy spoke for about

12   five minutes, and then Ecology Human Resources Director Sandi Stewart arrived. Nelson

13   Decl. Ex. 3 at 12:4–15. Ms. Stewart explained that protests, demonstrations, and canvassing

14   was only allowed outside. Nelson Decl. Ex. 3 at 13:2–12, Ex. 19 at 10:15–22. She clarified

15   that members of the public could visit the cafeteria until it closed, and could use the dining

16   rooms associated with the cafeteria. Nelson Decl. Ex. 3 at 12:4–13:1.

17       After Mr. Dewhirst and his cohort left, the canvassers requested permission to use

18   Ecology's cafeteria. Nelson Decl. Ex. 28 at 10:8–23.[6] Mr. Nasworthy directed the canvassers

19   to the cafeteria and watched as they began walking down the hallway towards it. *Id.* A few

20   minutes later, the canvassers returned to Mr. Nasworthy's security desk, again escorted by

21   Ecology staff, who reported that the canvassers had entered an Ecology meeting in a

22   conference room without permission and were attempting to distribute flyers and speak to the

23   meeting attendees. *Id.* at 10:23–11:8. Soon thereafter, Freedom Foundation's canvassers left

24   Ecology headquarters.

25           [6] The parties differ in their accounts of whether the canvassers' trip to the cafeteria occurred before or
after Mr. Dewhirst arrived at Ecology. *See* Dkt. 27 at 4. Ecology does not believe that this fact is material to the

26   Court's determination of the legal issues in this case.

DEFENDANTS' RESPONSE AND
CROSS-MOTION FOR SUMMARY
JUDGMENT (3:18-cv-05548-RBL)

14

ATTORNEY GENERAL OF
WASHINGTON
Ecology Division
PO Box 40117
Olympia, WA 98504-0117
360-586-6770

1

2.     **December 2017 – Freedom Foundation refuses to follow Ecology's directions for canvassing at its headquarters building**

2

3     In December 2017, Mr. Hayward contacted Ms. Stewart and told her he again

4     intended to send Freedom Foundation canvassers to canvass in Ecology's lobby. Nelson

5     Decl. Ex. 21, Ex. 3 at 34:3–8. As in 2015, Ms. Stewart told Mr. Hayward that Ecology's

6     policies do not allow canvassing in the building, but that Freedom Foundation could canvass

7     outside of Ecology's building, on Desmond Drive. Nelson Decl. Ex. 21. Mr. Hayward

8     requested the policies to which Ms. Stewart was referring, so Ms. Stewart emailed him

      copies of Policy 14-10 and Policy 15-01. *Id.*

9

10     After sending Mr. Hayward the policies, Ms. Stewart received an email from

11     Freedom Foundation staff attorney David Dewhirst. *Id.* Mr. Dewhirst stated that he did not

12     believe that the policies prevented Freedom Foundation from canvassing inside Ecology's

13     building, and would be advising canvassers "to proceed in leafletting" in Ecology's lobby. *Id.*

14     at 2. Ms. Stewart reiterated Ecology's policies, and again offered Freedom Foundation the

       option of canvassing on Desmond Drive. *Id.*

15

16     On the morning of December 17, 2017, Freedom Foundation canvasser Jack Cates

17     stood on Desmond Drive dressed in a Santa Claus costume, held a large poster, and

18     distributed flyers. Nelson Decl. Ex. 18 at 15:11–22, Ex. 3 at 38:15–39:9. Mr. Cates greeted

19     people as they drove in and out of Ecology's driveway. Nelson Decl. Ex. 18 at 15:25–16:3.

       Around lunchtime, Mr. Cates left. *Id.* at 16:17–22.

20

21     Later that day, three members of Freedom Foundation entered Ecology's lobby and

22     began canvassing: canvasser Sandy Belzer, staff attorney Hannah Marcley, and photographer

23     Boaz Crawford. Nelson Decl. Ex. 18 at 20:11–12, 20:24–21:1. None of them signed in. *Id.* at

24     25:1–5. Like Mr. Cates, Ms. Belzer was dressed in a Santa Claus costume, carried a large

       poster, and was attempting to distribute flyers. Nelson Decl. Ex 3 at 39:9–13.

25

26

DEFENDANTS' RESPONSE AND
CROSS-MOTION FOR SUMMARY
JUDGMENT (3:18-cv-05548-RBL)

15

ATTORNEY GENERAL OF
WASHINGTON
Ecology Division
PO Box 40117
Olympia, WA 98504-0117
360-586-6770

1    Ms. Stewart went to the lobby to speak with the Freedom Foundation canvassers. *Id.*

2    She saw Ms. Belzer attempt to speak with an Ecology supported employee[7] as he and his job

3    coach passed through the lobby. Nelson Decl. Ex. 3 at 40:3–16. As she had done with Mr.

4    Dewhirst and Mr. Hayward, Ms. Stewart explained to Ms. Marcley that canvassing activities

5    needed to occur outside on Desmond Drive. *Id.* at 41:22–42:4. Freedom Foundation does not

6    like this option, as their canvassers would "have to endure the December weather." Hayward

7    Decl. ¶ 9. After a brief discussion with Ms. Stewart regarding past meetings between WFSE

8    and Ecology bargaining unit employees in the lobby, the canvassers left. Nelson Decl. Ex. 3

9    at 40:22–41:16, Ex. 18 at 29:1–16.

10    Approximately six months later, the Freedom Foundation sued Ecology alleging a

11    First Amendment violation, and asking this Court to "[d]eclare that Ecology's practice and

12    policy of forbidding Freedom Foundation from expressing its views in a nondisruptive

13    manner on public property violates the First Amendment," and "[p]ermanently enjoin

14    Ecology, its officers, agents, servants, employees, and all persons in active concert or

15    participation with them from enforcing this policy . . . ." Dkt. 1 at 9.

16    ### III.    ARGUMENT

17    **A.    Standard of Review**

18    This Court can grant summary judgment in favor of a moving party who shows that

19    there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a

20    matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

21    (1986). When both parties file motions for summary judgment, each movant has the burden of

22    presenting evidence to support its motion that would allow the district court, if appropriate, to

23

24

25    ───────────────

       [7] Supported employment in state government means employment for individuals with significant disabilities who require on-the-job training and long-term support in order to fulfill their job duties successfully

26    and offers the same benefits and wages as non-supported employment positions. Wash. Rev. Code § 41.04.750.

DEFENDANTS' RESPONSE AND                    16                    ATTORNEY GENERAL OF
CROSS-MOTION FOR SUMMARY                                              WASHINGTON
JUDGMENT (3:18-cv-05548-RBL)                                         Ecology Division
                                                                    PO Box 40117
                                                                    Olympia, WA 98504-0117
                                                                    360-586-6770

1    direct a verdict in its favor. *See High Tech Gays v. Def. Indus. Sec. Clearance Office*, 895 F.2d

2    563, 574 (9th Cir. 1990) (overruled on other grounds by *SmithKline Beecham Corp. v. Abbott*

3    *Labs.*, 740 F.3d 471, 484 (9th Cir. 2014)).

4    **B.    The Policies Regulating Speech in Ecology's Lobby Do Not Violate Freedom Foundation's First Amendment Rights**

5        Freedom Foundation's First Amendment claim fails as a matter of law. The undisputed

6    evidence shows that Ecology's lobby has never been a designated location for public

7    expressive activity. To the extent some expressive activity has occurred in the lobby, it has

8    been incidental to, and in the context of, pre-approved, authorized agency business. Although

9    Freedom Foundation presents a different version of its 2015 and 2017 visits to Ecology,

10   *see* Dkt. No. 27 at 4–7, under either party's version this Court should determine that Ecology's

11   lobby is a nonpublic forum, and that the agency's policies are reasonable, viewpoint neutral

12   regulations of its property.

13       "Nothing in the Constitution requires the Government freely to grant access to all who

14   wish to exercise their right to free speech on every type of Government property without

15   regard to the nature of the property or to the disruption that might be caused by the speaker's

16   activities." *Mansky*, 138 S. Ct. at 1885 (quoting *Cornelius*, 473 U.S. at 799–800). Rather, the

17   "existence of a right of access . . . and the standard by which limitations upon such a right must

18   be evaluated differ depending on the character of the property at issue." *Perry Educ. Ass'n v.*

19   *Perry Local Educators' Ass'n*, 460 U.S. 37, 44 (1983). Where, as here, the government seeks

20   to place restrictions on its property that limit a constitutionally protected[8] form of expression, a

21   court will analyze the restriction using a "forum based" approach. *See Int'l Soc. For Krishna*

22   *Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992) (*ISKCON*).

23       As such, there are "three types of government-controlled spaces: traditional public

24   forums, designated public forums, and nonpublic forums." *Mansky*, 138 S. Ct. at 1885.

25

26       [8] Ecology concedes that canvassing is expressive activity protected by the First Amendment.

DEFENDANTS' RESPONSE AND
CROSS-MOTION FOR SUMMARY
JUDGMENT (3:18-cv-05548-RBL)                17                ATTORNEY GENERAL OF
WASHINGTON
Ecology Division
PO Box 40117
Olympia, WA 98504-0117
360-586-6770

Traditional public forums are "parks, streets, sidewalks, and the like," while designated public forums are "spaces that have not traditionally been regarded as a public forum but which the government has intentionally opened up for that purpose." *Mansky*, 138 S. Ct. at 1885 (internal quotation marks and citations omitted). In contrast, nonpublic forums are those spaces that are "not by tradition or designation a forum for public communication . . . ." *Id.* Restrictions on speech in traditional and designated public forums are subject to strict scrutiny and must be "necessary to serve a compelling state interest and . . . narrowly drawn to achieve that interest." *Cornelius*, 473 U.S. at 800. Alternatively, restrictions on speech in nonpublic forums are permissible "as long as the restrictions are reasonable and [are] not an effort to suppress expression merely because public officials oppose the speaker's view." *Id.* (quoting *Perry,* 460 U.S. at 46) (internal quotation marks omitted).

### 1.    Ecology's lobby is not a designated public forum

Freedom Foundation contends that Ecology's lobby is a designated public forum, such that any restrictions imposed on the lobby must withstand strict scrutiny review. Dkt. 27 at 10. In making its arguments, however, Freedom Foundation glosses over the central inquiry in a designated forum determination: whether government intended to create a public forum in the first place. Because the undisputed evidence shows Ecology's clear intent to control and limit the use of its headquarters lobby, Freedom Foundation's claim fails as a matter of law. But, even if this Court determines that the lobby is a designated public forum, Ecology's policies should be upheld as reasonable time, place, and manner restrictions.

It is axiomatic that government does not create a public forum haphazardly, or by default. *Cornelius*, 473 U.S. at 802; *Preminger v. Principi*, 422 F.3d 815, 824 (9th Cir. 2005). As such, "it is the government's purpose, not the forum's users, that informs the characterization of the forum." *Preminger*, 422 F.3d at 824. "The defining characteristic of a designated public forum is that it is open to the same indiscriminate use and almost unfettered

DEFENDANTS' RESPONSE AND
CROSS-MOTION FOR SUMMARY
JUDGMENT (3:18-cv-05548-RBL)

18

ATTORNEY GENERAL OF
WASHINGTON
Ecology Division
PO Box 40117
Olympia, WA 98504-0117
360-586-6770

1  access that exist[s] in a traditional public forum." *Seattle Mideast Awareness Campaign v.*

2  *King Cty.*, 781 F.3d 489, 496 (9th Cir. 2015) (internal citations and quotation marks omitted).

3      Accordingly, in order to prove that Ecology's lobby is a designated public forum,

4  Freedom Foundation must show: 1) Ecology's policies demonstrate an intent to open the lobby

5  to indiscriminate use by all or part of the general public; 2) Ecology routinely ignores the terms

6  of its policies such that in practice permission is granted "as a matter of course to all who seek

7  it"; and 3) the lobby is "designated for and dedicated to expressive activities," and not "used

8  primarily as part of a government-run commercial enterprise, [such that] the expressive

9  activities the government permits are only incidental to that use . . . ." *Seattle Mideast*,

10  781 F.3d at 497; *see also Perry*, 460 U.S. at 47. As a matter of law, Freedom Foundation

11  cannot meet this burden.

12              a.      **Ecology's lobby can only be used for discrete purposes, none of which
                        show an intent to open the lobby as a public forum**

13      Freedom Foundation fails to point to any evidence, other than their own tortured

14  readings of Ecology's policies, showing that the agency intends to open the lobby as a public

15  forum. On their face, Ecology's policies state what is—and what is not—a permissible use of

16  its facilities. Absent evidence that Ecology intends to open its lobby for public speech and

17  expression, Freedom Foundation's claim fails.

18      Freedom Foundation contends that Ecology's policies are vague, and do not "draw

19  clear lines between permissible and impermissible speech." Dkt. 27 at 10. The Foundation

20  argues that this demonstrates Ecology's intent to designate the lobby as a public forum. *Id.* at

21  12–13. In support of its position, Freedom Foundation criticizes the content and structure of

22  the headings in Ecology's policies, and faults Ecology for not defining the terms "solicit,"

23  "promote," or "outside organization" within the policies themselves. *Id.* at 12. The group also

24  claims the phrase "on behalf of an outside organization" is unclear, as is Ecology's policy that

25  permissible uses of the lobby must be "related to Ecology business." *Id.* at 13–14.

26

                                                      19              ATTORNEY GENERAL OF
                                                                           WASHINGTON
                                                                           Ecology Division
                                                                           PO Box 40117
                                                                      Olympia, WA 98504-0117
                                                                           360-586-6770

But Freedom Foundation's intent to "find fault at any cost" with Ecology's policies does not render them so vague that they are incapable of being applied. *See U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 413 U.S. 548, 579 (1973) ("Surely, there seemed to be little question in the minds of the plaintiffs who brought this lawsuit as to the meaning of the law, or as to whether or not the conduct in which they desire to engage was or was not prohibited by the Act."). Moreover, Freedom Foundation distorts this Court's forum determination analysis. Where, as here, the contested government property does not constitute a traditional public forum, courts will determine whether an applicable policy shows a clear intent to *open* the property to expressive activity—not to close it. *Cornelius*, 473 U.S. at 802. This distinction is consistent with the long-held principle that not all government property is presumptively open for First Amendment protected activities. *Id.* at 799–800; *Mansky*, 136 S. Ct. at 1885.

Ecology's policies do not show a clear intent to open the lobby as a public forum. In fact, they show the opposite. The policies grant access to visitors so long as they have a reason for being present at Ecology that is related to the agency's business, i.e., they have an appointment with an Ecology employee, or are present to attend a public hearing, an authorized meeting, or participate in an approved charitable activity. Nelson Decl. Ex. 11 at 1.

Freedom Foundation relies heavily on *Hopper v. City of Pasco*, 241 F.3d 1067 (9th Cir. 2001), but that case is highly distinguishable. In *Hopper*, the City of Pasco had no stated policy or guidelines (written or unwritten) for accepting artwork for display in the public hallways of Pasco City Hall. In fact, the City had delegated the responsibility for obtaining artwork to a private organization, rather than establishing its own review and approval process. The Ninth Circuit found that the City's policies "lacked any definite standards," such that it had opened up the hallways of City Hall as a designated public forum. *Id.* at 1078. In contrast, Ecology has definite, written policies that have been in place for decades, and that provide

DEFENDANTS' RESPONSE AND
CROSS-MOTION FOR SUMMARY
JUDGMENT (3:18-cv-05548-RBL)

20

ATTORNEY GENERAL OF
WASHINGTON
Ecology Division
PO Box 40117
Olympia, WA 98504-0117
360-586-6770

1   clear guidelines for gaining access to its lobby. Nor has Ecology delegated its authority to

2   regulate its property to a private organization.

3          Ecology's policies are also more definite than the law at issue in *Minnesota Voters*

4   *Alliance v. Mansky*. In that case, the Supreme Court overturned a Minnesota law that

5   prohibited voters from wearing "political apparel" in polling places on Election Day. Although

6   it recognized that a polling place is a nonpublic forum, the Court nevertheless held that the

7   law's "unmoored use of the term 'political'. . . combined with haphazard interpretations" by

8   the state, rendered it unreasonable. *Mansky*, 138 S. Ct. at 1888. The Court found that the law

9   failed to provide "objective, workable standards" to election judges tasked with enforcing it.

10  *Id.* at 1891. In particular, the law's prohibition of "issue oriented material" and "any item

11  promoting a group with recognizable political views" was at risk of subjective interpretation

12  and "erratic application" based on the personal knowledge and background of the individual

13  enforcing the restriction. *Id.* at 1889–90.

14         Here, Ecology's policies provide objective guidelines for Ecology officials tasked with

15  enforcing them. Unlike the term "political" used in Minnesota's constitutionally infirm election

16  law, an entity's status as an "outside organization" under Ecology's policies is a matter of

17  objective fact—not of subjective interpretation. Either the organization meets one of the

18  exceptions to Ecology's policies, or it does not. Thus, Freedom Foundation fails to demonstrate

19  as a matter of law that Ecology's policies show an intent to create a public forum.

20         **b.**    **Ecology has consistently enforced its policies when managing access to its lobby**

21  

22         Freedom Foundation claims that Ecology has enforced the exceptions to its policies in

23  an "ad hoc" manner, and only against Freedom Foundation. Dkt. 27 at 15. But these assertions

24  are directly contradicted by undisputed evidence that Freedom Foundation omits from its

25  briefing. Freedom Foundation cannot point to any facts that show Ecology's enforcement has

26  led to indiscriminate use of its lobby by the public.

DEFENDANTS' RESPONSE AND
CROSS-MOTION FOR SUMMARY
JUDGMENT (3:18-cv-05548-RBL)

21

ATTORNEY GENERAL OF
WASHINGTON
Ecology Division
PO Box 40117
Olympia, WA 98504-0117
360-586-6770

As explained above, there is nothing "ad hoc" about Ecology's regulation of its lobby. Like any location in an Ecology facility, all events or meetings in the lobby must be connected to a specific, work-related activity authorized by the Legislature in order to qualify as an appropriate use of state resources under state ethics laws. All of the examples on which Freedom Foundation relies had an Ecology employee sponsor, and were reviewed and approved by Ecology staff prior to occurring. *See* Nelson Decl. Ex. 7 at 39:23–40:3, Ex. 15, Ex. 24, Ex. 26, Ex. 20 at 3–4. And all are expressly authorized by the Legislature as an appropriate use of state resources. *See* Wash. Admin. Code § 434-750-020; Wash. Rev. Code § 41.04.033 (2018) (Combined Fund Drive); Wash. Rev. Code § 70.94.521 (2018) (Commute Trip Reduction Program); Wash. Rev. Code § 41.80.005(2) (2018); Ex. 22 at 104–05, 107–08 (CBA). The fact that Ecology's policy allows some groups to use its lobby as part of an agency-approved activity is not evidence of inconsistency. *See Greer v. Spock*, 424 U.S. 828, 838, n.10 (1976).

Second, Ecology has offered Freedom Foundation the same options for expressive activity as other outside groups. Ecology directed the Sierra Club to confine its recent protest to the plaza in front of Ecology's headquarters building, and prohibited the group from entering the lobby, except to use the restroom. Norberg Decl. ¶¶ 8, 9, Ex. 23. In addition, Ecology prevented its cafeteria vendor from hosting a coffee tasting in the lobby with Olympia Coffee Company. Nelson Decl. Ex. 3 at 77:8–19, 78:6–25. These undisputed facts show Ecology has not opened its lobby up to indiscriminate use by the public.

### c. Ecology's lobby is not conducive to a designated public forum

In arguing that the nature of the lobby lends itself to a designated public forum, Freedom Foundation misrepresents the physical layout of the lobby and Ecology's policies. The lobby is not, as Freedom Foundation contends, a "sprawling open space." Dkt. 27 at 16. Rather, the lobby is sectioned off into different areas serving various purposes, such as 1) event and workspace for Ecology employees, 2) a reception and security area for greeting and

DEFENDANTS' RESPONSE AND
CROSS-MOTION FOR SUMMARY
JUDGMENT (3:18-cv-05548-RBL)

22

ATTORNEY GENERAL OF
WASHINGTON
Ecology Division
PO Box 40117
Olympia, WA 98504-0117
360-586-6770

registering visitors, 3) a waiting area for visitors, and 4) a walkway for Ecology staff to access

the secured workspaces on either side of Ecology's building. *See* Nelson Decl. Exs. 1, 5.

Courts have found that such high-traffic areas are not conducive to expressive activity. *See*

*ISKCON*, 505 U.S. at 682–83; *Preminger*, 422 F.3d at 824; *Families Achieving Indep. &*

*Respect v. Nebraska Dep't of Soc. Servs.*, 111 F.3d 1408 at 1421 (8th Cir. 1997) (FAIR).

Additionally, sound can carry from the open atrium of the lobby upward and into the

workspaces on the two floors above. This is hardly a "public plaza." Dkt. 27 at 16.

Freedom Foundation provides a declaration from Matthew Hayward stating that on or

about August 22, 2019, Mr. Hayward "was told at the reception desk that the lobby was open

to the public and I could take photos at my leisure." Hayward Decl. ¶ 6. While a statement

from an Ecology receptionist that the lobby is "open to the public" does not establish that it is a

public forum under the First Amendment, the hearsay statement in Mr. Hayward's declaration

is completely false. *See* Declaration of Melissa Anderson in Support of Defendants' Response

and Cross-Motion for Summary Judgment ¶¶ 4–12.

None of the evidence in this case supports a determination that Ecology has intended to

designate its lobby as a public forum. Rather, the undisputed facts show that Ecology's policies

are clear, consistently enforced, and appropriate given the logistical challenges the agency

faces in managing its facilities. This Court should find that Freedom Foundation has failed as a

matter of law to meet its burden to show Ecology's lobby is a designated public forum.

  **2.**  **Ecology's policies are narrowly tailored and connected to the agency's interests in complying with state law and managing its buildings**

Even if Freedom Foundation had met its burden of demonstrating Ecology's lobby is a

designated public forum, Ecology's policies would satisfy strict scrutiny as reasonable time,

place, and manner restrictions. The government has a significant interest in protecting the

integrity of the purposes to which it has dedicated its property. *U.S. v. Kokinda*, 497 U.S. 720,

739 (1990) (Kennedy, J., concurring) (plurality). Thus, when regulating a designated public

DEFENDANTS' RESPONSE AND
CROSS-MOTION FOR SUMMARY
JUDGMENT (3:18-cv-05548-RBL)

23

ATTORNEY GENERAL OF
WASHINGTON
Ecology Division
PO Box 40117
Olympia, WA 98504-0117
360-586-6770

1   forum, government can still impose "reasonable restrictions on time, place, or manner of

2   speech, provided the restrictions are justified without reference to the content of the regulated

3   speech . . . are narrowly tailored to serve a significant governmental interest, and . . . leave

4   open ample alternative channels for communication of the information." *Ward v. Rock Against*

5   *Racism*, 491 U.S. 781, 791 (1989). Ecology's policies withstand strict scrutiny.

6                   **a.    Ecology's policies are content neutral**

7         Freedom Foundation contends that Policy 14-10 is "content-based on its face" because

8   "[d]etermining whether speech is promotion or solicitation requires consideration of content"

9   and Ecology staff must "refer to content to determine whether the speech is connected to an

10  outside organization." Dkt. 27 at 16. Freedom Foundation misapprehends this element of strict

11  scrutiny review.

12        "Government regulation of speech is content based if a law applies to particular speech

13  because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert,*

14  *Ariz.*, 135 S. Ct. 2218, 2227 (2015). "A regulation that serves purposes unrelated to the content

15  of expression is deemed neutral, even if it has an incidental effect on some speakers or

16  messages but not others." *Ward*, 491 U.S. at 791. "The principal inquiry in determining content

17  neutrality . . . in time, place, or manner cases . . . is whether the government has adopted a

18  regulation of speech because of disagreement with the message it conveys." *Ward*, 491 U.S.

19  at 791; *see also Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 295 (1984).

20        Freedom Foundation asserts that Policy 14-10 is impermissibly content-based because

21  enforcing the policy "requires reference to speech's content…." Dkt. 27 at 17. Not so. The

22  policy presumptively excludes all visitors from Ecology facilities, unless the visitor has

23  business to conduct with Ecology. Whether the visitor wanted to "promote or solicit for an

24  outside organization," or simply stand in Ecology's lobby and sing the national anthem

25  because they enjoyed the acoustics, neither would be allowed under Policy 14-10 because the

26  visitor had no purpose for being in the building, other than their own.

DEFENDANTS' RESPONSE AND
CROSS-MOTION FOR SUMMARY
JUDGMENT (3:18-cv-05548-RBL)

24

ATTORNEY GENERAL OF
WASHINGTON
Ecology Division
PO Box 40117
Olympia, WA 98504-0117
360-586-6770

1    Freedom Foundation incorrectly relies on *Reed v. Town of Gilbert*. In *Reed*, the

2    Supreme Court overturned a town code governing the manner in which people could display

3    outdoor signs. The law distinguished between ideological signs, political signs, and temporary

4    directional signs, with ideological signs treated most favorably, followed by political, and then

5    temporary directional signs. The Court held that the sign regulations were facially content

6    based because their restrictions depended "entirely on the communicative content of the sign."

7    *Reed,* 135 S. Ct. at 2227. However, the Court clarified that government can still prohibit sign

8    posting on public property, "so long as it does so in an evenhanded, content-neutral manner."

9    *Id.* at 2232 (citing *Members of City Coun. of City of Los Angeles v. Taxpayers for Vincent*, 466

10   U.S. 789, 817 (1984)).

11       Ecology's prohibition on all promotion and solicitation by outside groups is more akin

12   to the sign regulations at issue in *Taxpayers for Vincent*, than it is to the sign regulations in

13   *Reed*. In *Taxpayers for Vincent*, the Supreme Court upheld a City of Los Angeles law

14   prohibiting the posting of signs on public property. 466 U.S. at 817. The *Reed* Court cited

15   *Taxpayers for Vincent* as an example of government regulation applied "in an evenhanded,

16   content-neutral manner." *Reed*, 135 S. Ct. at 2232. The acts of solicitation and promotion

17   prohibited by Policy 14-10 are analogous to the postings prohibited by the City's law. Both

18   involve the regulation of expression on government property, with the only difference being

19   the medium chosen by the speaker to convey his or her message. And, both allow exceptions

20   for government-related purposes. *See Taxpayers for Vincent*, 466 U.S. at 792, n.1; Nelson

21   Decl. Ex. 11. The Court should conclude that Policy 14-10 is content neutral.

22       **b.    Ecology's policies further compelling government interests and are
             narrowly tailored to achieve those interests**

23       Even if the Court concludes that Ecology's policies are content-based, they still

24   withstand strict scrutiny review because they are narrowly tailored to further several

25   compelling government interests. Those interests include compliance with state law, and

26

DEFENDANTS' RESPONSE AND
CROSS-MOTION FOR SUMMARY
JUDGMENT (3:18-cv-05548-RBL)                          25                          ATTORNEY GENERAL OF
                                                                                      WASHINGTON
                                                                                      Ecology Division
                                                                                      PO Box 40117
                                                                                  Olympia, WA 98504-0117
                                                                                      360-586-6770

maintaining a safe and secure facility for Ecology employees. Nelson Decl. Exs. 8, 11. The requirement of narrow tailoring is satisfied "so long as the . . . regulation promotes a substantial government interest that would be achieved less efficiently absent the regulation." *Ward*, 491 U.S. at 799 (quoting *U.S. v. Albertini*, 472 U.S. 675, 689 (1985). Ecology's policies meet this standard.

First, a prohibition on solicitation and promotion by outside groups is key to Ecology's ability to ensure that no unauthorized use of state resources occurs. Without this, groups could enter and use Ecology's lobby for non-work related purposes, and Ecology could run afoul of state ethics laws. Indeed, Ecology routinely relies on this part of its policies to prevent commercial and noncommercial groups from using the lobby. Nelson Decl. Ex. 3 at 77:8–19, 78:6–25; Norberg Decl. ¶¶ 6–7, 9–12. The undisputed evidence shows that this prohibition is serving its intended effect, as the only past permissible uses of the lobby have been for Ecology-approved charitable activities, bargained-for WFSE representational activities, or activities related to statutorily-mandated goals, such as commute trip reduction.

Second, Ecology's policies help ensure that employees and authorized visitors are able to travel through the lobby safely, and without impediment. The lobby is a heavily trafficked area of the agency's headquarters, as Freedom Foundation recognizes. Hayward Decl. ¶ 9. Moreover, Freedom Foundation's two visits to Ecology were not "passive" as the Foundation suggests. *See* Nelson Decl. Ex. 28 at 15:23–25, Ex. 3 at 40:3–16. Regardless, the Supreme Court has recognized that the act of solicitation, even if passive, can provoke an interaction that leads to disruption and congestion in corridors like Ecology's lobby. *See ISKCON*, 505 U.S. at 683–84. As the Sierra Club's recent rally on Ecology's campus shows, Ecology's policies are essential to preventing the disruption and congestion the Supreme Court has already recognized is likely when acts of solicitation occur.

Finally, Freedom Foundation argues that a noise complaint from an Ecology employee about the Sustainability Committee's plant sale in the lobby demonstrates that Ecology's

DEFENDANTS' RESPONSE AND
CROSS-MOTION FOR SUMMARY
JUDGMENT (3:18-cv-05548-RBL)

26

ATTORNEY GENERAL OF
WASHINGTON
Ecology Division
PO Box 40117
Olympia, WA 98504-0117
360-586-6770

policies do not achieve their intended objective. Dkt. 27 at 20. But the employee's complaint illustrates precisely why Ecology cannot open its lobby up to use by outside groups—noise carries from the lobby up into Ecology workspace, and over to receptionists as they answer phones and process visitors. A government policy does not become constitutionally infirm based on an outsider's opinion of whether they are effective or not. *Albertini*, 472 U.S. at 689 ("The validity of such regulations does not turn on a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests."). Thus, if the Court reaches this part of its analysis, it should rule as a matter of law that Ecology's policies are narrowly tailored to promote its twin interests of complying with the law, and maintaining a safe, secure, and productive work environment.

> ### c.   Freedom Foundation refused two alternative channels of communication offered by Ecology

Ecology has offered, and Freedom Foundation has refused, two adequate alternative channels for communicating its message at Ecology headquarters: standing on Desmond Drive, or standing in the outdoor plaza directly in front of the lobby. Freedom Foundation's reasons for rejecting these alternatives are unavailing.

The Foundation claims that canvassing in Ecology's lobby during work hours is the only way to communicate their message to Ecology employees. But the Foundation's actions prove the exact opposite. In December 2017, Freedom Foundation sent a canvasser to stand on Desmond Drive dressed in a Santa Claus costume, holding a large poster, distributing flyers, and greeting people as they arrived at Ecology. Nelson Decl. Ex. 18 at 15:11–16:3. Additionally, the Foundation claims that it is unfair to require its paid canvassers to leaflet outside when it is cold, but admits that canvassers go door-to-door to speak with public employees at their homes, an activity that clearly requires the canvasser to spend at least some time outdoors. Hayward Decl. ¶ 9; Nelson Decl. Ex. 27 at 8:25–9:6.

DEFENDANTS' RESPONSE AND
CROSS-MOTION FOR SUMMARY
JUDGMENT (3:18-cv-05548-RBL)

27

ATTORNEY GENERAL OF
WASHINGTON
Ecology Division
PO Box 40117
Olympia, WA 98504-0117
360-586-6770

Freedom Foundation's decision to send canvassers to state agencies in December does not afford their organization special treatment under Ecology's policies. *See Cornelius*, 473 U.S. at 799. Ecology's policies do not suddenly become constitutionally infirm simply because they do not allow Freedom Foundation to communicate its message at the exact time, place, and manner it desires. *See Clark*, 468 U.S. at 296–97. The Foundation fails to show why the channels of communication that Ecology has offered are inadequate under the First Amendment.

As a matter of law, Freedom Foundation cannot establish that Ecology's lobby is a designated public forum. Ecology's policies, its history of enforcement, and the nature of the lobby do not indicate the agency's intent to open the lobby for unfettered expressive activity. To the contrary, the only distinction between the lobby and other meeting spaces in Ecology's building is that the lobby is visible to outsiders, while the other meeting spaces are not. However, even if this Court determines that Ecology's lobby is a designated public forum, the policies regulating the lobby are reasonable time, place, and manner restrictions. This Court should deny Freedom Foundation's motion for summary judgment, and grant summary judgment to Ecology.

### 3.    Ecology's lobby is a nonpublic forum

A nonpublic forum is all public property that is not by tradition or designation a forum for public communication. *Mansky*, 138 S. Ct. at 1885. Freedom Foundation has not established that Ecology's lobby constitutes a designated forum, nor does the Foundation contend that the lobby is a traditional public forum. Rather, the manner in which Ecology has regulated access to, and use of, its headquarters lobby is consistent with other "special enclaves" courts have determined to be nonpublic forums. *See, e.g., ISKCON*, 505 U.S. at 680. This Court should determine as a matter of law that Ecology's lobby is a nonpublic forum.

Courts have consistently found public property to be a nonpublic forum where the evidence shows, as it does in this case, that the property's purpose is to conduct or facilitate

DEFENDANTS' RESPONSE AND
CROSS-MOTION FOR SUMMARY
JUDGMENT (3:18-cv-05548-RBL)

28

ATTORNEY GENERAL OF
WASHINGTON
Ecology Division
PO Box 40117
Olympia, WA 98504-0117
360-586-6770

1   government business, and not to provide a forum for public expression. *See Mansky*, 138 S. Ct.

2   at 1879 (polling places); *Perry*, 460 U.S. at 47 (employee mailboxes); *Greer*, 424 U.S. at 838

3   (military base); *Principi*, 422 F.3d at 824 (Department of Veterans Affairs nursing home). This

4   also includes instances in which the government is acting in its proprietary capacity to raise

5   money. *Cornelius*, 473 U.S. at 805–06.

6       The Ninth Circuit has not directly addressed the question of whether an interior agency

7   lobby constitutes a nonpublic forum. However, the Eighth, Second, and Eleventh Circuits all

8   have, and in each case concluded that the agency lobby was a nonpublic forum. *See FAIR*,

9   111 F.3d 1408; *Make the Road by Walking, Inc. v. Turner*, 378 F.3d 133 (2nd Cir. 2004);

10  *U.S. v. Gilbert*, 920 F.2d 878, 884 (11th Cir. 1991).

11      In *FAIR*, the case most analogous to the one before this Court, a grassroots welfare

12  rights organization (FAIR) attempted to distribute materials and speak with welfare recipients

13  in the lobby of the Nebraska Department of Social Services' (NDSS) office. Like Ecology, the

14  NDSS office lobby was a high traffic area meant for receiving visitors. To limit congestion,

15  NDSS had an unwritten policy of keeping the lobby "closed to outside groups," with the

16  exception of groups that provided a "direct benefit" associated with the "basic needs" of

17  NDSS' customers. *FAIR*, 111 F.3d at 1412. As such, NDSS allowed organizations providing

18  customers with free tax preparation assistance, nutritional information and recipes,

19  pre-kindergarten registration (Head Start), and community college courses (English as a

20  Second Language and GED) to access its office lobby. FAIR was not allowed the same access,

21  and challenged NDSS' policy, arguing that the lobby was a designated public forum because

22  some groups were allowed to distribute materials. The Eighth Circuit rejected this argument,

23  finding that the policy exception was permissible because the outside organizations

24  participated in NDSS' official business of providing social services to welfare recipients, and

25  furthered the agency's work in other government programs, such as a local job training

26  partnership and Department of Agriculture nutritional information program.

DEFENDANTS' RESPONSE AND
CROSS-MOTION FOR SUMMARY
JUDGMENT (3:18-cv-05548-RBL)

29

ATTORNEY GENERAL OF
WASHINGTON
Ecology Division
PO Box 40117
Olympia, WA 98504-0117
360-586-6770

1    The Eighth Circuit's well-reasoned analysis of NDSS' lobby should also apply here.

2    Like the "basic needs" organizations in *FAIR*, the organizations that have been allowed to

3    share information during events in Ecology's lobby have all been directly tied to the agency's

4    official business of 1) participating in statutorily authorized charitable activities, 2) complying

5    with the state-mandated Commute Trip Reduction Program, and 3) complying with the

6    agency's obligations under the state Collective Bargaining Agreement. *See respectively* Nelson

7    Decl. Ex. 8 at 3–4, Ex. 24; Ex. 12 at 11:21–12:3; Decl. Ex. 3 at 53:5–8. In fact, Ecology's

8    policies are even more structured than NDSS', as they contain strict pre-approval, ethics, and

9    sponsorship requirements that an employee sponsor must meet before the outside organization

10   can participate in an event on Ecology property. *See* Nelson Decl. Exs. 8, 11. Because

11   Ecology's lobby is not a traditional or designated public forum, and the main purpose of the

12   lobby is to conduct or facilitate agency business, this Court should hold as a matter of law that

13   Ecology's lobby is a nonpublic forum.

14       **4.     Ecology's policies are reasonable**

15       In nonpublic forums, such as Ecology's lobby, government can impose some

16   content-based restrictions on speech, including restrictions that exclude political advocates and

17   forms of political advocacy. *Mansky*, 138 S. Ct. at 1885–86; *Lamb's Chapel v. Ctr. Moriches

18   Union Free School Dist.*, 508 U.S. 384, 392–93 (1993). Such restrictions are permissible as

19   long as they are "reasonable and not an effort to suppress expression merely because public

20   officials oppose the speaker's view." *Cornelius*, 473 U.S. at 800 (quoting *Perry*, 460 U.S.

21   at 46). And while the government's decision to restrict access to a nonpublic forum must be

22   reasonable, "it need not be the *most reasonable* or the *only reasonable* limitation."

23   *Cornelius*, 473 U.S. at 808 (emphasis added). Government is not required to "narrowly tailor"

24   its regulation of a nonpublic forum, but rather must simply articulate a sensible basis for

25   distinguishing what is allowed in the forum, and what is not. *Mansky*, 138 S. Ct. at 1888.

26   Ecology's policies pass this "forgiving test." *Id.*

DEFENDANTS' RESPONSE AND
CROSS-MOTION FOR SUMMARY
JUDGMENT (3:18-cv-05548-RBL)

30

ATTORNEY GENERAL OF
WASHINGTON
Ecology Division
PO Box 40117
Olympia, WA 98504-0117
360-586-6770

As discussed above, Ecology's policies assist the agency in complying with state law, and maintaining a safe, secure, and productive work environment. The policies are directly tied to the purpose of the lobby, which is to facilitate Ecology business. "There is little doubt that . . . the government may ban the entry on to all public property that is not a 'public forum' of all persons except those who have legitimate business on the premises." *U.S. v. Grace*, 461 U.S. at 178. Restricting the promotion and solicitation of an outside organization or group in the lobby, with no connection to Ecology's official business, reasonably serves these purposes. *See ISKCON*, 505 U.S. at 683.

The Court should find as a matter of law that Ecology's policies regulating its lobby are reasonable restrictions under the First Amendment.

**5.      Ecology's policies are viewpoint neutral**

The undisputed evidence shows that Ecology applies its policies  in a viewpoint neutral manner. Freedom Foundation cannot identify any direct evidence of viewpoint discrimination, and instead argues that it can rely on "circumstantial evidence." Dkt. 27 at 18. But the "circumstantial evidence" Freedom Foundation points to is mostly a rehashing of its designated public forum arguments, with an additional contention that bargaining unit employees' ability to meet with their WFSE representatives in the lobby is evidence of viewpoint discrimination. *Id.* at 17–18. Freedom Foundation also claims Ecology revised Policy 14-10 with the intention of using the policy specifically to prevent the organization from leafletting in Ecology's lobby. As with Freedom Foundation's other arguments, these also rely on misstatements of fact, and misapplication of the law.

Government employers can provide "exclusive access to recognized bargaining representatives," such as WFSE, without offending the First Amendment. *See Perry*, 460 U.S. at 51. In *Perry*, a rival union challenged a school district's policy of only allowing the exclusive bargaining representative for teachers in the district to access the teachers' school mailboxes, and the interschool mail delivery system. After concluding that the mailboxes and

DEFENDANTS' RESPONSE AND
CROSS-MOTION FOR SUMMARY
JUDGMENT (3:18-cv-05548-RBL)

31

ATTORNEY GENERAL OF
WASHINGTON
Ecology Division
PO Box 40117
Olympia, WA 98504-0117
360-586-6770

1   interschool mail delivery system were a nonpublic forum, the Supreme Court held that such

2   "differential access" was reasonable because it was "wholly consistent" with the school

3   district's interest in preserving its property for the use to which it was lawfully dedicated.

4   *Perry*, 460 U.S. at 50–51. In addition, use of the mail facilities allowed the teachers union to

5   perform its obligations as the duly elected, exclusive bargaining representative of all teachers

6   in the district. *Id.* at 51. The rival union did not have "any official responsibility in connection

7   with the school district and need not be entitled to the same rights of access…." *Id.* And, the

8   rival union had several other methods of communicating with teachers in the district, such that

9   its ability to communicate was not "seriously impinged" by the district's policy. *Id.* at 53.

10      Ecology's policies are wholly consistent with *Perry*. As a matter of law, allowing

11   Ecology's represented employees to meet with their exclusive bargaining representative in the

12   lobby does not constitute "circumstantial evidence" of viewpoint discrimination. Nevertheless,

13   Freedom Foundation attempts to avoid *Perry* by mischaracterizing the nature of the lobby

14   meetings. The Foundation falsely claims that Ecology "grants union representatives frequent

15   access to the lobby for unmonitored expression." Dkt. 27 at 18. However, as explained by

16   Human Resources Director Sandi Stewart, and as shown in the plain language of Ecology's

17   policies, WFSE's use of the lobby is limited to representational activities, which Ecology must

18   confirm prior to the use occurring. Nelson Decl. Ex. 3 at 53:5–24, Ex. 12 at 15:13–16, Ex. 20

19   at 3–4. Regardless, Freedom Foundation may still "share unflattering facts about the union" on

20   Desmond Drive, or in the plaza in front of Ecology headquarters, consistent with the

21   alternative methods of communication offered by the school district in *Perry*. *See* Dkt. 27 at

22   18.[9]

23

24   ――――――――――――

25      [9] Freedom Foundation improperly portrays a remark by Mr. Nasworthy as "Ecology's official position on
   speech related to labor relations," Dkt. 27 at 18, when the Foundation knows that he is not authorized to speak for
   Ecology on such matters. *See* Nelson Decl. Ex. 3 at 8:12–17. Nevertheless, Mr. Nasworthy clarified that was only

26   expressing his own opinion, based on his own observations. Nelson Decl. Ex. 28 at 19:1–10.

DEFENDANTS' RESPONSE AND
CROSS-MOTION FOR SUMMARY
JUDGMENT (3:18-cv-05548-RBL)

32

ATTORNEY GENERAL OF
WASHINGTON
Ecology Division
PO Box 40117
Olympia, WA 98504-0117
360-586-6770

1         In criticizing WFSE's ability to meet with bargaining unit employees at Ecology,

2    Freedom Foundation relies on inapposite authority. In *City of Madison, Joint School District*

3    *No. 8 v. Wisconsin Employment Relations Commission*, the Supreme Court overturned an order

4    from the Wisconsin Employment Relations Commission that prohibited the school board from

5    allowing non-union teachers to speak about matters subject to collective bargaining during

6    Madison Board of Education meetings. 429 U.S. 167, 176 (1976). The Court's central holding

7    in that case focused on the fact that "when the board sits in public meetings to conduct public

8    business and hear the views of citizens, it may not be required to discriminate between

9    speakers on the basis of their employment, or the content of their speech." *Id.* In contrast here,

10   Ecology is allowing bargaining unit employees to meet with their WFSE representatives in the

11   lobby—not conducting public business or holding a public meeting to hear the views of the

12   general public. Moreover, if Freedom Foundation *were* attending a public hearing at Ecology,

13   it would be exempt from Section 2 of Policy 14-10. Nelson Decl. Ex. 11 at 1. Thus, Freedom

14   Foundation's analogy fails.

15        Next, Freedom Foundation points to Ecology's revision of Policy 14-10 after the

16   Foundation's 2015 canvassing visit as "circumstantial evidence" of viewpoint discrimination.

17   Dkt. 27 at 18–19. But again, Freedom Foundation tells only part of the story. The Foundation's

18   2015 canvassing visit to Ecology came without any prior notice to the agency, and was

19   disorganized, confrontational, and resulted in a security breach that the agency took very

20   seriously. *See* Toteff Decl. ¶¶ 5–11. Afterwards, Ecology revised Policy 14-10 to more

21   explicitly incorporate its long-standing prohibition of the use of state resources to promote or

22   solicit on behalf of an outside organization. Nelson Decl. Ex. 7 at 7:13–18, 8:8–12, Exs.14 and

23   16. This is not evidence of viewpoint discrimination—it is evidence of a state agency trying to

24   prevent another security breach. Furthermore, even if there was some uncertainty as to whether

25   canvassing was allowed in Ecology's lobby in 2015, Ecology's decision to do away with such

26

DEFENDANTS' RESPONSE AND
CROSS-MOTION FOR SUMMARY
JUDGMENT (3:18-cv-05548-RBL)

33

ATTORNEY GENERAL OF
WASHINGTON
Ecology Division
PO Box 40117
Olympia, WA 98504-0117
360-586-6770

1    uncertainty is permissible under the First Amendment. *See Perry*, 460 U.S. at 46; *Make the*

2    *Road by Walking*, 378 F.3d at 146, n.9 ("[G]overnment may, without offending the First

3    Amendment, reverse policies regarding access to government property.").

4            Freedom Foundation attempts, unsuccessfully, to analogize itself to *Pittsburgh League*

5    *of Young Voters Educ. Fund v. Port Auth. of Allegheny Co.*, 653 F.3d 290 (3d Cir. 2011). In

6    that case, the Third Circuit held that the Port Authority had impermissibly rejected a bus ad

7    proposed by the ACLU informing ex-prisoners of their right to vote in Pennsylvania. *Id.*

8    at 299. Although the Court of Appeals agreed that the Port Authority's policy prohibiting

9    "noncommercial" ads on its buses was facially viewpoint neutral, the Court nevertheless found

10   that the Port had engaged in viewpoint discrimination. In arriving at this conclusion, the Court

11   employed a "comparator analysis," of other noncommercial ads that the Port had accepted, and

12   determined that like the ACLU's ad, they were all designed to educate readers about their legal

13   rights. *Id.* at 297–98. On these facts, the Court found that the Port's rejection of the ACLU's ad

14   constituted viewpoint discrimination.

15           Here, all the examples Freedom Foundation highlights (Intercity Transit, Thurston

16   County Food Bank, WFSE, Joy Ride Bikes) are examples of organizations participating in an

17   internal Ecology event or meeting tied to a statutorily-authorized use of state resources. In

18   contrast, Freedom Foundation sought to use Ecology's lobby to canvass without any

19   connection to an internal Ecology event or meeting, and solely to communicate its message.

20   This is not evidence of "lax" or "underinclusive enforcement"—it is simply evidence of how

21   Ecology's policies are intended to work. Moreover, in order for the Third Circuit's

22   "comparator analysis" for underinclusiveness to apply in this case, Freedom Foundation would

23   need to show that it was denied access to Ecology's lobby *and* the organizations allowed

24   access do not meet the exceptions to Ecology's policies.  As with its other arguments, Freedom

25   Foundation fails to show that Ecology engaged in viewpoint discrimination.

26

DEFENDANTS' RESPONSE AND
CROSS-MOTION FOR SUMMARY
JUDGMENT (3:18-cv-05548-RBL)

ATTORNEY GENERAL OF
WASHINGTON
Ecology Division
PO Box 40117
Olympia, WA 98504-0117
360-586-6770

1

**IV.    CONCLUSION**

2

The Court should deny Freedom Foundation's motion for summary judgment, grant

3

summary judgment to Ecology, and dismiss this case with prejudice.

4

DATED this 30th day of September 2019.

5

ROBERT W. FERGUSON
Attorney General

6

7

_s/ Emily C. Nelson_
_s/ Elizabeth Delay Brown_

8

EMILY C. NELSON, WSBA #48440
ELIZABETH DELAY BROWN, WSBA #21521

9

Assistant Attorneys General
Attorneys for Defendant

10

Office of the Attorney General
Ecology Division
PO Box 40117

11

Olympia, WA  98504-0117
Telephone: 360-586-6770

12

Email: ECYOLYEF@atg.wa.gov
        emily.nelson@atg.wa.gov

13

        elizabeb@atg.wa.gov

14

15

16

17

18

19

20

21

22

23

24

25

26

DEFENDANTS' RESPONSE AND
CROSS-MOTION FOR SUMMARY
JUDGMENT (3:18-cv-05548-RBL)

35

ATTORNEY GENERAL OF
WASHINGTON
Ecology Division
PO Box 40117
Olympia, WA 98504-0117
360-586-6770