HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| FREEDOM FOUNDATION, a Washington State Nonprofit Corporation, | CASE NO. C18-5548RBL |
| Plaintiff, | ORDER |
| v. | |
| WASHINGTON DEPARTMENT OF ECOLOGY, a Washington State Agency; SANDI STEWART, in her official capacity as Director of Human Resources for the Washington Department of Ecology, | |
| Defendants. | |

# I. INTRODUCTION

THIS MATTER is before the Court on competing Motions for Summary Judgment [Dkt. #s 27 and 30]. For the reasons stated below, Plaintiff Freedom Foundation's Motion for Summary Judgment [Dkt. #27] is **DENIED,** and Defendants' Motion for Summary Judgment [Dkt. #30] is **GRANTED.** Freedom Foundation's Complaint is **DISMISSED** with prejudice.

## II. STATEMENT OF FACTS

The facts are largely undisputed. Freedom Foundation is a Washington non-profit organization devoted to individual liberty, free enterprise, and limited, accountable government. Its work includes public advocacy, research, canvassing, and litigation. Freedom Foundation canvasses to notify government employees of their rights with respect to public sector unions. It particularly canvasses about the opportunity to opt-out from financial support of union activities. *Janus v. AFSME*, 138 S. Ct. 2448 (2018). Freedom Foundation canvassers go door-to-door and visit government office buildings. This case arises from Freedom Foundation's desire and effort to hand out information in the lobby area of the Department of Ecology headquarters. It argues that its canvassers can contact more employees and distribute their message more effectively there than outside the building.

The Washington State Department of Ecology's mission is to protect, preserve, and enhance the environment for current and future generations. The Legislature created Ecology to manage and develop Washington State's "air and water resources in an orderly, efficient, and effective manner, and to carry out a coordinated program of pollution control" to protect those resources. Wash. Rev. Code § 43.21A.020 (2018).

Ecology's statewide headquarters is located at 300 Desmond Drive SE, in Lacey, Washington. The building is three stories, 323,000 gross square-feet, and is open for business from 8:00 a.m. to 5:00 p.m., Monday through Friday. The building houses approximately 900 Ecology employees, in addition to staff for three tenant agencies: the U.S. Environmental Protection Agency, the Washington State Conservation Commission, and Pollution Liability Insurance Agency. Desmond Drive runs north to south on the west side of Ecology's headquarters. A one-way driveway, extending perpendicular from Desmond Drive, traverses the

entire length of the north side of the building. The driveway leads to staff and visitor parking east of the headquarters building, curves, and then returns to Desmond Drive.

Ecology headquarters has one visitor entrance on the north side of the building, in front of a large square patio area. The visitor entrance opens into the headquarters lobby. Both the north and south sides of the lobby are floor-to-ceiling glass windows. The lobby is an atrium that is open to the building's ceiling. The two floors above the lobby are open to the atrium, such that sound from the lobby carries upward and into the workspaces on those floors.

There are reception and security desks adjacent to the visitor entrance, and a placard in front of the entrance directs visitors to sign in upon arrival. Visitors must also obtain a visitor's badge and provide their name, the agency or company they represent, the employee they are visiting or public meeting they are attending, time of arrival, badge number from the visitor's badge they receive, and time of departure. By requiring visitors to sign in, Ecology can determine their purpose for being present in the building, and account for building occupants in the event of an emergency.

On the west end of the lobby, locked glass doors secured by keycard access separate most of Ecology's first-floor workspace from the lobby. Access to the workspace requires an Ecology-issued keycard, and an Ecology employee (or one of its tenant's employees) must escort all visitors entering the area. A workspace previously used by Ecology's Sustainability Coordinator is in a cubicle in a sunken part of the southwest corner of the lobby. There are four other sunken areas with glass cases displaying artifacts related to the history of Ecology and its work. There are also seating areas for visitors and Ecology staff to use while waiting to conduct Ecology-related business.

The parking structure and parking lots for employees and visitors are located on the east side of the headquarters buildings. Employees enter the building from the parking structure, through a keycard secured entrance that leads into the east end of the lobby. Employees then must pass through the lobby to access the workspaces on the west end of the lobby. Conversely, Ecology employees who work in the west end workspaces must also pass through the lobby to access the cafeteria and meeting rooms in the eastern portion of the building.

The purpose for the entire headquarters building, and the employees it houses, is to conduct the work required of Ecology for the State of Washington. Accordingly, visitors are not allowed to loiter in the lobby, nor are they able to reserve it for private use. Only Ecology employees and tenants may request to use the lobby for meetings or events, and permission is given only if such uses are consistent with state ethics laws and Ecology policies.

In December 2015, Freedom Foundation sent canvassers to the Thurston County lobbies of the Washington Department of Natural Resources, the Washington Department of Enterprise Services, and Ecology. The canvassers dressed in Santa Claus costumes and carried holiday-themed materials. At each location, one or two canvassers carried a poster, a sign, and handouts. The poster was red, white, and green and decorated with snowflakes. At the top of the poster, in large font, were the words. "Give Yourself a Raise." Below, in smaller font, it said: "You work hard for your money—keep more of it." And, at the bottom, the poster explained how to opt out.

In December 2015, the Foundations' outreach director, Matthew Hayward, and canvasser Elmer Callahan visited Ecology headquarters in Lacey, Washington. They checked in at the front desk, informed the receptionist why they were there, and gave her a Freedom Foundation business card. The security guard on duty, Ken Nasworthy, was under the mistaken impression that the Freedom Foundation employees were from the union—Freedom Foundation staff were

unaware of his misapprehension at the time—and informed them that they could have access to the building if they signed in.

After this 2015 incident, Ecology added new language to Administrative Policy 14-10, entitled "Reserving and Using Ecology Facilities," that restricted visitor expression while on Ecology premises. Section 2 of Policy 14-10—which became effective in April 2017—begins with a bolded heading: "**Visitors may not use Ecology facilities to promote or conduct commercial enterprise**." Below the heading is an indented description of the rule: "Visitors also may not use Ecology facilities to promote or solicit for an outside organization or group." Ecology's designated representative testified that this language was added to Policy 14-10 in response to Freedom Foundation's 2015 visit.

In December 2017, the Freedom Foundation once again sent holiday canvassers to state buildings to inform workers how to opt out of union dues if they so desired. As before, canvassers, dressed as Santa, were permitted to leaflet in the lobbies of several state buildings, including the Department of Natural Resources and the Department of Fish and Wildlife. The holiday canvassers in 2017 carried a poster and handouts. Once again, no materials contained Freedom Foundation's name or promoted it. The poster was green and red, with an image of a lump of coal in the middle. At the top, in large font, were the words "WFSE [Washington Federation of State Employees] has been naughty." In the bottom half, the poster listed an internet address, OptOutToday.com, which directs readers to a website entitled "Opt Out Today." In December 2017 the site explained workers' rights with respect to union membership. The poster did not list Freedom Foundation's name, and neither the poster nor the website promoted or solicited for the Foundation.

Before visiting Ecology, the Freedom Foundation outreach director spoke with Defendant Sandi Stewart, Ecology's Human Resources Director, about canvassing plans. She responded that Freedom Foundation would not be allowed to leaflet in the lobby. The director asked for a written policy that forbade such activity. In response, Stewart sent an email attaching the newly amended Policy 14-10. The Foundation spokesman stated his belief that the policy did not forbid Freedom Foundation's plans because its speech was not promoting itself or soliciting.

When the Foundation canvassers arrived, Stewart approached and told them they could not pass out information inside the building. The Freedom Foundation attorney asked why Freedom Foundation canvassers could not pass out information in the lobby, even though WFSE used the lobby for representational activities. Stewart responded that the WFSE could use the lobby because of the collective bargaining agreement (CBA) between Ecology and WFSE. The conversation ended, and Foundation staff left Ecology.

### III. APPLICABLE POLICIES

To ensure the safety and security of its facilities and their occupants, Ecology requires visitors to identify themselves and their purpose for being there. Executive Policy 7-10 and Executive Procedure 7-10-01 outline the visitor sign-in requirements and describe security measures for all Ecology facilities. The policy makes clear the need for visitors to be escorted if they are attending a meeting in a space that is in a secure work area.

Administrative Policy 14-10 generally governs the use of Ecology facilities and has been in place since the 1990s. The primary purposes of Policy 14-10 are to establish standards for the use of Ecology facilities that will ensure: 1) outside agencies and visitors are treated fairly and consistently when visiting Ecology facilities, 2) parking is managed so building occupants and clients have adequate parking space, 3) facilities are properly secured during meetings and events

occurring on site, and 4) compliance with Ecology Executive Policy 15-01 prohibiting the private use of state resources. Relevant in this case, Section 2 of Policy 14-10 prohibits visitors from using Ecology facilities to promote or solicit for an outside organization or group. The only exceptions are public hearings or meetings held according to [Policy 14-10] or activities approved as a charitable activity according to Policy 15-01.

The primary purpose of Executive Policy 15-01 is to ensure compliance with Washington State ethics laws, and to describe Ecology's position and requirements regarding the use of state resources. This policy has been in place since at least the early 1990s. It prohibits the misuse of state resources by employees and articulates Ecology's expectations. Although the Policy is directed towards employees, it describes situations that would constitute a violation of Washington State ethics law as it pertains to anyone's use of state resources. Ecology bases its interpretation of Policy 15-01 on Washington State Executive Ethics Board advisory opinions, and other guidance provided by the State Executive Ethics Board.

Ecology employees are prohibited from using or allowing any state resources to be used for any personal gain. This includes supporting, promoting or soliciting for an outside organization or group, unless allowed by law and authorized by Ecology's director or designee.

In addition to Ecology's internal policies, the CBA between the State and the WFSE (the exclusive bargaining representative of certain Ecology employees) governs WFSE's use of, and access to, Ecology's facilities.

Article 39 of the CBA provides that WFSE staff representatives may have access to Ecology's facilities in accordance with Ecology's internal policies, to conduct representational activities with bargaining unit employees.

# IV. SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether an issue of fact exists, the Court must view all evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Anderson Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986); *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996). A genuine issue of material fact exists where there is sufficient evidence for a reasonable factfinder to find for the nonmoving party. *Anderson*, 477 U.S. at 248. The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. At 251-52. The moving party bears the initial burden of showing that there is no evidence which supports an element essential to the nonmovant's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the movant has met this burden, the nonmoving party then must show that there is a genuine issue for trial. *Anderson*, 477 U.S. at 250. If the nonmoving party fails to establish the existence of a genuine issue of material fact, "the moving party is entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 323-24.

# V. DISCUSSION

The undisputed evidence shows that Ecology's lobby has never been a designated location for public expressive activity. To the extent some expressive activity has occurred in the lobby, it has been incidental to, and in the context of, pre-approved, authorized agency business. Ecology's lobby is a nonpublic forum, and that the agency's policies are reasonable, viewpoint neutral regulations of its property.

"Nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." *Minnesota Voters All v. Mansky*, 138 S. Ct. at 1885 (quoting *Cornelius*, 473 U.S. at 799-800). Rather, the "existence of a right of access . . . and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44 (1983). Where, as here, the government seeks to place restrictions on its property that limit a constitutionally-protected form of expression, a court analyzes the restriction using a "forum-based" approach. *See Int'l Soc. For Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992) (*ISKCON*).

As such, there are "three types of government-controlled spaces: traditional public forums, designated public forums, and nonpublic forums." *Mansky*, 138 S. Ct. 1876, at 1885 (2018). Traditional public forums are "parks, streets, sidewalks, and the like," while designated public forums are "spaces that have not traditionally been regarded as a public forum but which the government has intentionally opened up for that purpose." *Id.* (internal quotation marks and citations omitted). In contrast, nonpublic forums are those spaces that are "not by tradition or designation a forum for public communication[.]" *Id.* Restrictions on speech in traditional and designated public forums are subject to strict scrutiny and must be "necessary to serve a compelling state interest and . . . narrowly drawn to achieve that interest." *Cornelius v. NAACP Legal Def. and Educ. Fund, Inc.*, 473 U.S. 788, at 800 (1985). In contrast, restrictions on speech in nonpublic forums are permissible "as long as the restrictions are reasonable and [are] not an effort to suppress expression merely because public officials oppose the speaker's view." *Id.* (quoting *Perry,* 460 U.S. at 46) (internal quotation marks omitted).

Freedom Foundation contends that Ecology's lobby is a designated public forum, such that any restrictions imposed on the lobby must withstand strict scrutiny review. Freedom Foundation's arguments ignore the central inquiry in a designated forum determination: whether government intended to create a public forum in the first place. Because the undisputed evidence shows Ecology's clear intent to control and limit the use of its headquarters lobby, Freedom Foundation's claim fails as a matter of law.

Ecology's policies do not show a clear intent to open the lobby as a public forum. In fact, they show the opposite. The policies grant access to visitors so long as they have a reason for being present at Ecology that is related to the agency's business, i.e., they have an appointment with an Ecology employee, or are present to attend a public hearing, an authorized meeting, or participate in an approved charitable activity.

Ecology has definite, written policies that have been in place for decades, and that provide clear guidelines for gaining access to its lobby. Moreover, Ecology has not delegated its authority to regulate its property to a private organization.

The Department of Ecology limits use of its lobby for Ecology-driven purposes, employee sponsored activities and legislative mandated or authorized functions. One of the most frequent permissible uses of the lobby is for charitable activities. An Ecology employee must sponsor all charitable activities, and the employee must complete Ecology Form 010-80 to obtain approval for the activity. Ecology Human Resources Director Stewart is responsible for reviewing and approving or denying the requests. An approved charitable activity does not have to be connected to Ecology's thematic focus as an agency (i.e., conservation or environmental issues).

Most of the charitable activities that occur at Ecology are part of the Washington State Combined Fund Drive (CFD). The CFD is Washington's workplace giving program for active and retired state employees. It is the only authorized solicitation of Washington state employees in the workplace. *See* Wash. Admin. Code § 434-750-020; Wash. Rev. Code § 41.04.0331. State employees can donate to the CFD, which disperses funds to several approved charities.

Ecology employees have also formed an internal Sustainability Committee, which maintains a vegetable garden on the grounds of Ecology's headquarters. The Sustainability Committee donates all food grown in the garden to the Thurston County Food Bank, which is an approved CFD charity. To raise money for gardening supplies, the Sustainability Committee hosts a plant sale in Ecology's lobby. During the plant sale, Ecology has allowed the Food Bank to distribute information about the organization to Ecology employees to inform them about the final destination of the food grown in the garden.

In addition to employee-sponsored charitable activities, Ecology's policies also allow events related to Washington's Commute Trip Reduction Program to occur in its facilities. The Legislature requires all state agencies, including Ecology, to implement programs that reduce single-occupant vehicle commuting by state employees. Wash. Rev. Code § 70.94.521 (2018).

As part of the state Commute Trip Reduction Program, Ecology has employed a Sustainability and Transportation Specialist to organize events to educate Ecology employees about their different options for commuting to work. These events have featured Intercity Transit, which provides information about vanpools, bus lines, and other forms of public transport in the South Puget Sound region. Additionally, to support those employees who commute by bicycle, Ecology has also allowed Joy Ride Bikes, a local bike shop, to hold a bike repair and maintenance demonstration for Ecology employees in the lobby. Ecology would

review any information provided by Joy Ride Bikes to ensure it was connected to Ecology's commute trip reduction program. These organizations' participation is permissible under Ecology's policies because they help Ecology inform its employees about the state Commute Trip Reduction Program.

Ecology also allows its bargaining unit employees to meet with WFSE representatives in the lobby of Ecology's headquarters, among other places in the building, provided all meetings comport with Ecology's policies and the CBA. Ecology and WFSE have bargained additional terms and conditions that must be met before these meetings can occur. These conditions were put in place in September 2015. The use of lobby space is requested either by an Ecology bargaining unit employee, or a WFSE representative, or both. The meeting requestor must describe the purpose and subject of the meeting before receiving approval from either Ecology's labor relations manager or Human Resources Director Stewart. As the exclusive bargaining representative of Ecology employees, WFSE is not considered an outside organization under Ecology's policies to the extent it engages in representational activities on behalf of Ecology employees. However, WFSE is prohibited from using Ecology facilities for union organizing, internal union business, advocating for or against the union in an election, or any other purpose prohibited by the state Executive Ethics Board.

Some requested uses within the building have been denied. As discussed above, Ecology's policies generally prohibit the use of its facilities by outside organizations or groups, both commercial and non-commercial. Ecology rejected an attempt by its former cafeteria food service provider to hold a tasting with Olympia Coffee Roasting Company in Ecology's lobby. The vendor organized the tasting to get feedback from Ecology employees on the type of coffee the vendor should sell in the cafeteria. Ecology directed the vendor to hold the tasting in the

cafeteria, which the vendor had a contract to use for such purposes, rather than the lobby, as such use would constitute a violation of Ecology's policies.

Similarly, Ecology's policies do not allow outside organizations or groups to canvass, leaflet, protest, or demonstrate inside its facilities. Instead, such activities must occur on the sidewalks along Desmond Drive, or in the outdoor plaza directly in front of the building. For example, on September 23, 2019, the Sierra Club held a rally at Ecology headquarters to protest two proposed industrial projects that must obtain permits from Ecology. Ecology learned of the planned rally via social media, and contacted Sierra Club ahead of time to communicate logistics, and the acceptable location and activities of rally participants. Because of the large number of participants (approximately 100), Ecology allowed the group to stand in the plaza in front of its headquarters, and only allowed participants to enter the building in small groups to use the restroom.

As a matter of law, Freedom Foundation has not established that Ecology's lobby is a designated public forum. Ecology's policies, its history of enforcement, and the nature of the lobby do not indicate the agency's intent to open the lobby for unfettered expressive activity. To the contrary, the only distinction between the lobby and other meeting spaces in Ecology's building is that the lobby is visible to outsiders, while the other meeting spaces are not.

Courts have consistently found public property to be a nonpublic forum where the evidence shows, as it does in this case, that the property's purpose is to conduct or facilitate government business, and not to provide a forum for public expression. *See Mansky*, 138 S. Ct. at 1879 (polling places); *Perry*, 460 U.S. at 47 (employee mailboxes); *Greer*, 424 U.S. at 838 (military base); *Principi*, 422 F.3d at 824 (Department of Veterans Affairs nursing home). This

also includes instances in which the government is acting in its proprietary capacity to raise money. *Cornelius*, 473 U.S. at 805-06.

The Ninth Circuit has not directly addressed the question of whether an interior agency lobby constitutes a nonpublic forum. However, the Eighth, Second, and Eleventh Circuits all have, and in each case concluded that the agency lobby was a nonpublic forum. *See FAIR*, 111 F.3d 1408; *Make the Road by Walking, Inc. v. Turner*, 378 F.3d 133 (2nd Cir. 2004); *U.S. v. Gilbert*, 920 F.2d 878, 884 (11th Cir. 1991).

In nonpublic forums, such as Ecology's lobby, government can impose some content-based restrictions on speech, including restrictions that exclude political advocates and forms of political advocacy. *Mansky*, 138 S. Ct. at 1885-86; *Lamb's Chapel v. Ctr. Moriches Union Free School Dist.*, 508 U.S. 384, 392-93 (1993). Such restrictions are permissible as long as they are "reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Cornelius*, 473 U.S. at 800 (quoting *Perry*, 460 U.S. at 46). And while the government's decision to restrict access to a nonpublic forum must be reasonable, "it need not be the *most reasonable* or the *only reasonable* limitation." *Cornelius*, 473 U.S. at 808 (emphasis added). Government is not required to "narrowly tailor" its regulation of a nonpublic forum, but rather must simply articulate a sensible basis for distinguishing what is allowed in the forum, and what is not. *Mansky*, 138 S. Ct. at 1888. Ecology's policies pass this test as a matter of law.

//

//

//

## VI. CONCLUSION

For these reasons, Plaintiff Freedom Foundation's Motion for Summary Judgment [Dkt. #27] is **DENIED,** and Defendants' Motion for Summary Judgment [Dkt. #30] is **GRANTED.** Freedom Foundation's Complaint is **DISMISSED** with prejudice.

IT IS SO ORDERED.

Dated this 3rd day of December, 2019.

Ronald B. Leighton
United States District Judge